IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| MALCOLM RENWICK AND<br>RENWICK & ASSOCIATES, P.C., | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| ARCHER D. BONNEMA, | § | |
| JACOB BONNEMA, THE MILLENNIUM | § | Civil Action No.:  2:08-cv-337 |
| MULTIPLE EMPLOYER WELFARE | § | |
| BENEFIT PLAN, MILLENNIUM | § | |
| MARKETING GROUP, LLC, | § | |
| INNOVUS FINANCIAL SOLUTIONS, | § | |
| INC., NORMAN H. BEVAN, | § | |
| JONATHAN COCKS, | § | |
| KATHLEEN BARROW, SCOTT RIDGE, | § | |
| RIDGE INSURANCE, INC., REPUBLIC | § | |
| BANK & TRUST, BKD, LLP, | § | |
| SECUREPLAN ADMINISTRATORS, | § | |
|  LLC, AND MILLIMAN, INC | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT – CIVIL RICO

Malcolm Renwick and Renwick & Associates, P.C. ("Renwick"), Plaintiffs, complain of

Defendants Archer D. Bonnema and Jacob Bonnema ("the Bonnema Defendants"), The Millennium

Multiple Employer Welfare Benefit Plan ("Millennium Plan"), Norman H. Bevan, Millennium

Marketing Group, L.L.C. and Innovus Financial Solutions, Inc. ("Bevan"), Jonathan Cocks

("Cocks"), Kathleen Barrow ("Barrow"), Scott Ridge, Ridge Insurance, Inc. ("Ridge"), Republic

Bank and Trust ("RBT"), BKD, LLP ("BKD"), SecurePlan Administrators, LLC ("SecurePlan") and

Milliman, Inc. (formerly Milliman USA) ("Milliman") and show as follows:

# I.

## JURISDICTION AND VENUE

1.01    This is a federal question case.  This Court has jurisdiction under 18 U.S.C. §1964(c) (Civil RICO).  This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 USC §1367 as these claims are intricately related to Plaintiffs' RICO claim and form part of the same case or controversy.

1.02    Venue is proper in the U.S. District Court for the Eastern District of Texas pursuant to applicable law including 18 U.S.C. §1965(a).  Plaintiff Renwick is an individual residing in the Eastern District of Texas.  Plaintiff Renwick & Associates is a professional corporation with its principal place of business in the Eastern District of Texas.  The Bonnema Defendants reside and work in the Eastern District of Texas.   Additionally, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Texas and all Defendants are co-conspirators who have performed acts in furtherance of the conspiracy in this district.

1.03    Venue is proper in this court under 18 U.S.C. §1965(a) and 28 U.S.C. §1391 because:

·    Plaintiffs reside here.

·    The Bonnema Defendants reside here.

·    All or a substantial part of the events giving rise to Plaintiffs' cause of action occurred here.

·    The Defendants' conduct constitutes a civil conspiracy to engage in **mail** and **wire** fraud in this district and all of the Defendants were aware of, and consented to, the Bonnemas' conduct in this district which is part of the conduct on which Plaintiffs' claims are based.

·    The money out of which Plaintiffs were defrauded was paid from this district.

·    The Defendants, through their express agents, the Bonnema Defendants, have engaged in extensive and systematic conduct in this district with the intended purpose of defrauding Plaintiffs out of $174,332.00.

·    Defendants have operated, and continue to operate, an ongoing enterprise which has existed

for six years and they operate the enterprise by a continuous, systematic pattern of racketeering activity which has defrauded over five hundred people nationwide by **mail** and **wire** fraud and the fraud perpetrated against Plaintiffs in this district was substantially identical to the fraud perpetrated on the other victims.

·       The fraudulent representations upon which this suit is based were made to Plaintiffs in this district.

·       Defendants have **mailed** to Plaintiffs in this district by U.S. **mail** numerous documents in furtherance of the fraud.  All documents **mailed** to Plaintiffs in furtherance of the fraud were **mailed** to Plaintiffs in this district.

## II.

## PARTIES, SERVICE AND VENUE

2.01    Malcolm G. Renwick is a citizen of the State of Texas, residing in the Eastern District of Texas.

2.02    Renwick & Associates, P.C., is a Texas professional corporation with its sole place of business in the Eastern District of Texas.

2.03    Defendant Archer D. Bonnema is a citizen of Texas who resides and conducts business in the Eastern District of Texas, and whose actions gave rise to these claims.  Archer D. Bonnema may be served with process by serving him at his regular place of business:

604 Kings Lake Drive
McKinney, Texas 75070-8779

2.04    Defendant Jacob Bonnema is a citizen of Texas who resides and conducts business in the Eastern District of Texas, and whose actions gave rise to these claims.  Jacob Bonnema may be served with process by serving him at his regular place of business:

404 Kings Lake Drive
McKinney, Texas 75070-8779

2.05    Defendant Millennium Marketing is a purported Mississippi limited liability corporation that markets investments in the Millennium Plan through agents such as Bevan, Ridge and the Bonnema Defendants.  Millennium Marketing's principal place of business is in Houston, Texas, and their actions in the Eastern District of Texas gave rise to these claims.  Because Defendant Millennium Marketing does not maintain a registered agent in Texas for service of process, Millennium Marketing may be served as follows:

Office of the Secretary of State
Statutory Documents Section – Citations Unit
P. O. Box 12079
Austin, Texas 78711-2079
-or-
1019 Brazos Street
Austin, Texas 78701

2.06    Defendant Millennium Plan is a Mississippi taxable trust and purports to be a multiple employer welfare benefit plan, but in fact is nothing but an entrepreneurial device used by Defendants to sell life insurance to generate commissions.  Millennium Plan's principal place of business is in Houston, Texas, and its actions in the Eastern District of Texas gave rise to these claims.  Because Defendant Millennium Plan does not maintain a registered agent in Texas for service of process, Millennium Plan may be served as follows:

Office of the Secretary of State
Statutory Documents Section – Citations Unit
P. O. Box 12079
Austin, Texas 78711-2079
-or-
1019 Brazos Street
Austin, Texas 78701

2.07    Defendant Innovus is an active Texas for-profit corporation whose principal place of

business is in Houston Texas, and whose actions in the Eastern District of Texas gave rise to these

claims.  Innovus may be served with process by serving its registered agent:

Walter C. Wilson
909 Fannin Street, Suite 1125
Houston, Texas 77010

2.08    Defendant Bevan is an individual citizen of the State of Texas whose actions in the

Eastern District of Texas gave rise to these claims.  Bevan may be served with process at his regular

place of business:

Norman H. Bevan
2777 Allen Pkwy, Suite 1122
Houston, Texas 77019

2.09    Defendant Cocks is an individual citizen of the State of Texas whose actions in the

Eastern District of Texas gave rise to these claims.  Cocks may be served with process at his regular

place of business:

Jonathan Cocks
3205 Walker Drive
Richardson, Texas 75082

2.10    Defendant Barrow is an individual citizen of the State of Texas whose actions in the
Eastern District of Texas gave rise to these claims.  Barrow may be served with process at her
regular place of business:

Kathleen R. Barrow
c/o Jackson Lewis, LLP
1415 Louisiana, Suite 3325
Houston, Texas 77002-7360

2.11    Defendant Scott Ridge is an individual citizen of the State of Pennsylvania whose

actions in the Eastern District of Texas gave rise to these claims.  Scott Ridge may be served with

process at his regular place of business:

Scott A. Ridge
Strath Haven Condominiums

801 Yale Avenue, Suite 626
Swarthmore, PA 19081-9978

2.12    Defendant Ridge Insurance, Inc. is an active Pennsylvania corporation whose principal place of business is in Swarthmore, Pennsylvania, and whose actions in the Eastern District of Texas gave rise to these claims.  Because Ridge Insurance, Inc. does not maintain a registered agent in Texas for service of process, Ridge Insurance, Inc., may be served as follows:

Office of the Secretary of State
Statutory Documents Section – Citations Unit
P. O. Box 12079
Austin, Texas 78711-2079
-or-
1019 Brazos Street
Austin, Texas 78701

2.13    Defendant Republic Bank and Trust is a bank and trust organized in the State of Oklahoma, whose principal place of business is at 3510 W. Robinson, Norman, Oklahoma, and whose actions in the Eastern District of Texas gave rise to these claims.  Because Republic Bank and Trust does not maintain a registered agent in Texas for service of process, Republic Bank and Trust may be served as follows:

Office of the Secretary of State
Statutory Documents Section – Citations Unit
P. O. Box 12079
Austin, Texas 78711-2079
-or-
1019 Brazos Street
Austin, Texas 78701

2.14    Defendant BKD, LLP is an active Missouri limited liability partnership whose principal place of business is in Springfield, Missouri, and whose actions in the Eastern District of Texas gave rise to these claims.  BKD, LLP may be served with process by serving its Texas registered agent:

David A. Hayob
2800 Post Oak Blvd., Suite 3200
Houston, Texas 77056-6167

2.15    Defendant SecurePlan Administrators, LLC, is an Oklahoma limited liability company with its principal place of business in Norman, Oklahoma, and whose actions in the Eastern District of Texas gave rise to these claims.  Because SecurePlan does not maintain a registered agent in Texas for service of process, SecurePlan may be served as follows:

Office of the Secretary of State
Statutory Documents Section – Citations Unit
P. O. Box 12079
Austin, Texas 78711-2079
-or-
1019 Brazos Street
Austin, Texas 78701

2.16    Defendant Milliman, Inc. (formerly Milliman USA) is an active Washington corporation whose principal place of business is in Seattle, Washington, and whose actions in the Eastern District of Texas gave rise to these claims.  Milliman, Inc. may be served with process by serving its registered agent:

C T Corporation System
350 N. St. Paul Street
Dallas, Texas 75201

## III.

## AGENCY

3.01    Defendants were and are engaged in a conspiracy to defraud and each of them are liable for the actions of the other as if they themselves had committed the acts.  All Defendants were acting as the agents of the others with either express or implied authority to so act in furtherance of their common goal to operate a RICO enterprise and all Defendants benefitted financially therefrom

and ratified the acts of the others.  Therefore, all Defendants are jointly and severally liable for the actions of every other Defendant committed in furtherance of the conspiracy.

## IV.

## SUMMARY OF COMPLAINT

4.01    This is a Civil RICO **mail/wire fraud** case in which the Defendants defrauded 500+ people nationwide out of $300+ million by using an enterprise purporting to be an ERISA employee welfare benefit plan.

## V.

## RELEVANT FACTS

### A.    Summary.

5.01    The Millennium Multiple Employer Welfare Benefit Plan is a RICO enterprise.  This RICO enterprise was originally devised by Bevan, Ridge and Barrow during 2001.  It is ongoing and is structured and operates as follows[1]:

5.02    These Defendants formed a purported "employer welfare benefit plan" to use as a RICO enterprise, and individually and through their agents represented to their victims that it was an ERISA plan and that it qualified as a "10 or more employer plan" under IRC §419A(f)(6) which makes contributions to a bona fide plan tax deductible.  In fact, it is not an ERISA plan and it does

---

[1] The facts stated below were compiled from discovery obtained in cause number 06-03128, styled
    "*Murphy, et al v. Millennium, et al*", in the 193rd District Court of Dallas, County, Texas, which has been going on for two years.  In *Murphy*, the undersigned represent 19 plaintiffs and intervenors against 19 defendants.  This RICO suit is being filed because the discovery in Murphy has revealed
    the Defendants are using the Millennium Plan as a criminal enterprise which, stripped to its essentials,
    is a nationwide theft ring.  The Defendants have used the Millennium Plan as a RICO enterprise to swindle millions of dollars from hundreds of people.

not qualify under IRC §419A(f)(6).  The plan was devised solely to facilitate the sale of whole life policies which would generate exorbitant commissions.  Defendants have made millions of dollars with this arrangement and it is ongoing.

5.03    Bevan and Ridge are long time insurance salesmen.  Both of them have been selling life insurance through so-called "419A" plans for many years.

5.04    "419A" refers to Internal Revenue Code §419A (26 U.S.C. §419A) which pertains to the tax treatment of contributions to various welfare benefit funds.  Section 419A(f)(6) applies to a "10 or more employer plan" and excepts such plans from certain taxation limitations, the result of which is that an employer can deduct larger contributions to a bona-fide "10 or more employer plan" than can be deducted from some other types of plans.  This section was added to the IRC in 1984 – almost immediately, insurance salesmen began using this section to form bogus "Employer Welfare Benefit Plans."  Bevan's and Ridge's "Millennium Plan" is one of many.

5.05    Insurance salesmen alert on obscure provisions of the Revenue Code because if insurance premiums were tax deductible, they could sell a lot more insurance.

5.06    The 16th Amendment to the U.S. Constitution allowing the taxation of income was ratified February 3, 1913.  Soon thereafter, insurance salesmen began looking for a way to make insurance premiums tax deductible.  Their numerous associations, trade and lobbyist groups have tax lawyers on retainer monitoring the tax legislation and IRS regulations looking for ways to make premiums deductible. So far, there haven't been too many opportunities.  This is why, when §419A was passed in 1984, it drew the attention of insurance salesmen.

5.07    §419A pertains to *bona fide* employee welfare benefit plans, and not entrepreneurial insurance schemes, so insurance salesmen have encountered a few problems forming these plans, like:  1) the "10 or more employers" have to put their money in a fungible fund so that, like group

health insurance, everyone's premiums will be affected by the groups' losses; 2) employers have to contribute for employees – not just themselves; and 3) the cost of participation has to be "reasonable" in relation to the benefits received so that it will qualify as an "ordinary business expense."

5.08    These limitations of a bona fide 419A plan make it impossible for insurance salesmen to make "big" money from selling interest in *bona fide* plans.  But the fact that there exists *any* kind of insurance premium which *is* tax deductible made this provision a prime candidate for swindlers like Bevan and Ridge because the existence of a bona fide plan which can be funded by insurance makes it much easier to concoct a sham plan using insurance which, to a layman, looks like the real thing.

5.09    There is no economic incentive for insurance salesmen like Bevan and Ridge to pay a lawyer (like Barrow) to draft documents for a *bona fide* 419A plan because their intended victim class would not buy into it.  The cost to a small employer of forming a bona fide 419A plan – compared to the tax deduction – is just not economically feasible.  Ordinarily, insurance salesmen are wary of concocting a tax scam, but §419A has some unique incentives.  A genuine plan can be funded with insurance so any pretense is arguable – that is, an insurance salesman can devise *any* "plan" and, when the fraud is discovered, he can say he thought it would work, it's very complex, the rules changed, he didn't understand them, etc., etc.

5.10    This is what Bevan and Ridge have done.  In their mind, two forces are at play:  1) the lure of millions of dollars in profit; and 2) the risk of a §6700 fraud audit and multiple lawsuits.

5.11    The potential for millions of dollars in profits prevailed on this occasion.  Fraud audits and lawsuits were years down the road when the Millennium Plan was formed and Bevan and

Ridge counted on clever lawyering and voluminous, fallacious documentation to dodge liability when the inevitable finally occurred.

5.12    In 2001 Bevan and Ridge engaged Barrow to draft the documents for the Millennium Plan.  Barrow holds herself out as an "employee benefits lawyer."  But before Bevan and Ridge hired her, she had never even heard of §419A.  Barrow, like Bevan and Ridge, did it for the money.

5.13    In 2002 Barrow, Bevan and Ridge completed the Millennium Plan documents and this is a summary of them:

**a.    The Master Plan.**

5.14    The "Master Plan" document says that participating employers will make "contributions" to the plan for designated employees and that thereafter the employees will be entitled to "Life Benefits" and a "Death Benefit."  There is an innocuous mention that "insurance products" may be used to "fund plan benefits" but the words "life insurance" and "premium" are nowhere used.  (The importance of this point is explained below where a description is given of how the Defendants actually operated the RICO enterprise.)  The Master Plan Agreement is thirty pages long excluding exhibits.  It is occasionally accompanied by a fifteen page "Summary Plan Description."  This Master Plan specifically states that the "contributions" can be transferred from the Millennium Plan to an individual employer plan and the agents tell the victims this is how they get their money back – plus interest – "tax free" at retirement.  Barrow designed the Millennium Plan this way and told the sales agents that this was the loop hole that would allow an investor to get all of their investment, plus interest, back upon retirement while at the same time enabling them to take unlimited tax deductions for the contributions.  This is not true.

**b.    The Adoption Agreement.**

5.15    The insurance agent has the victim sign this document along with an insurance

application.  It says the "participant" is joining the Millennium Plan.  It nowhere discloses that virtually every dime of the "contribution" is used for insurance premiums and that as much as 90% of the first years "contributions" are used to pay commissions to the salesmen.  It contains many self-serving statements and disclaimers which are demonstratably false.

c.      **The Trust Agreement**.

5.16    The Trust Agreement is a contract is between Defendant Millennium Marketing Group, L.L.C. (which is owned by Defendants Bevan and Ridge) and Defendant RBT, the so-called "Trustee" who does basically nothing but hold the life insurance policies and send monthly invoices.  RBT also assists Cocks, Bevan and Ridge in confiscating the fraud victims' money.

5.17    Paragraph 9.02 of this agreement says that anyone who pays in money to the "Plan" can get it back if the money was paid "because of a mistake of fact" – but no one has ever gotten their money back, even when Defendants have acknowledged *in writing* that the participant was defrauded.

B.      **Detailed Description of the Operation of the RICO Enterprise.**

5.18    §419A has proved fertile ground for insurance swindlers.  The Everest of salesmen is to find a way to make the expense of their product or service tax deductible.  §419A caught the attention of unscrupulous insurance salesmen for three reasons:  1) such plans can be funded with insurance; 2) there is virtually no cap on the amount of the contribution; and 3) an unlimited number of "employers" can participate.  This is narcotic to corrupt insurance agents.  They can use a single arrangement to defraud as many people out of as much money as their persuasive skills allow.  So far, the Defendants and their agent force have conned over 500 people out of more than $300 million – and they have made millions of dollars in the process.

5.19    The criminal appeal of this scam is that a bona fide plan can be closely mimicked,

complete with voluminous paperwork, and a tax code section can be referenced to create the illusion of validity.  What the fraud victims don't know is:  1) the IRS has never approved a §419A(f)(6) insurance entreprenurial enterprise plan so far as the public record shows; 2) a bona fide §419A(f)(6) plan consists of 10 or more employers who put their money into the fund for the benefit of *employees*, not themselves (the Millennium Plan "participants" are all small business owners who put the money in for themselves and their spouses because of course, they were told this was a retirement investment vehicle and a legitimate way to plan for expenses later in life); 3) the plan must act like an insurance company – all the contributions go into one pot, no "experience rating" is allowed (that is, it must be similar to a group health plan, the loss experience of the group as a whole affects everybody's cost); 4) there cannot be any individualized accounting, i.e., all of the 10 or more employers put their money in one account and there are no "earnings" or "increases" attributable to any identifiable contributor; and 5) none of the employers who put the money in can ever get it out; it only comes out to reimburse an employee or their beneficiaries for death or medical expenses[2] – and the amounts for these items must be fixed and described in the plan – just like an insurance policy.

5.20    In addition to these elements of a bona fide §419A plan, the amount of the employers' contribution must be "reasonable in relation to the benefit received" and if life insurance is used to fund a plan, it must be "comparable to the cost of the same amount of term insurance."

5.21    This won't work at all for the scam plan because the plan's sole purpose is to sell whole life policies at excessive premiums that pay big commissions.  For example, Plaintiff Renwick

---

[2]There are certain approved methods upon dissolution whereby plan assets can be distributed.

was sold a $2,388,963.00 face amount whole life policy for which he would have paid $49,000.00 a year for 49 years! That's $2.4 million. He would have made more money with a CD. The same amount of term life is available for a fraction of the cost. When Plaintiff Renwick stopped payments and demanded return of his money, he was refused (**Exhibit 1**) and Defendants have informed him his money has been "forfeited."

5.22    Bevan and Ridge are insurance salesmen and the Millennium Plan was devised to sell insurance – specifically, whole and universal life policies which generate significant commissions. Insurance agents who form §419A plans use these life policies because 1) 90% of the first year premium goes to the agent as commission; 2) the policies are billed as an "investment" because they accumulate cash value – although compared to the expense, the potential returns are nominal; and 3) the premiums have to be paid for many years – and renewal commissions are paid every year. The lure, of course, is the money, which is also what attracts a sales force.

5.23    Bevan and Ridge could not sell the insurance through a typical agency force because that's too transparent. Bevan and Ridge had to make it appear as a *tax deducible investment* to the "participants," but as a *§419A plan* to the IRS. They had to balance this with the need to constantly forage for high-end clients who could put hundreds of thousands of dollars per year – for several years – into an "investment." The scheme requires the participation of people such as CPA's, lawyers and financial advisors who can give insurance salesmen an entre to well-off people. But the other consideration is that the insurance companies won't pay commissions to anyone but licensed insurance agents appointed with the company in the state where the sale is made. Enter – the Millennium University.

5.24    The Millennium University is a one day, slide show, pep rally conducted by Bevan, Ridge and Barrow. The first one was held in 2001 and participants were solicited by advertisements

sent through the **mail**.  The solicitations were sent to CPA's, lawyers, financial advisors and insurance agents and meetings were held in various states.  After "graduation" from the "University" the attendees are "licensed" by Bevan/Ridge to sell interest in the plan and are paid part of the insurance commission, purportedly, not for the insurance sale but for selling "participation" in the Millennium Plan.

5.25    Naturally, the Millennium Plan came to the attention of the IRS which issued a Letter Ruling with the legal conclusions shown in **Exhibit 2**; the IRS is presently conducting a §6700 fraud audit (for promoting an abusive tax shelter) against Defendants Bevan, Ridge and Barrow, and many "participants" (although not Plaintiffs – yet) have received a "30 day letter" like **Exhibit 3** informing them of hundreds of thousands of dollars in non-appealable penalties.  This means the penalties have to be paid within 30 days of receipt of the letter **or the IRS starts levying on assets**.

5.26    There is no question that Defendants intended to commit **mail** and **wire fraud** in connection with the operation of the Millennium Plan because the IRS has made it clear since the issuance of Notice 95-34 on June 5, 1995 (six years before the Millennium Plan swindle began) that so-called 10 or more employer plans *just like the Millennium Plan* did *not* qualify under §419A(f)(6) and that any deductions for money put into such plans would be disallowed.  See **Exhibit 4,** IRS Notice 95-34.

5.27    Every element of a disapproved plan described in Notice 95-34 is present in the Millennium Plan:  1) the plan was formed by insurance agent/promoters Defendants Bevan and Ridge; 2) these Defendants formed Millennium Marketing solely for the purpose of being the "Plan Sponsor" so that they could maintain control over the Plan; 3) the arrangement is invested in life policies which contain a significant investment component, like whole life or universal life policies;

4) the "contributions" used to pay premiums are vastly more than what would be required to buy the same amount of term insurance; 5) a trust owns the policies; 6) the money used to pay benefits is from insurance company loans against the cash value of the policies; 7) the "participants" put money into it because they expect to get it all back – with interest; and 8) there is individualized accounting through purported bogus "rating groups" (although the actual existence of these so-called "rating groups" is suspect; nobody in the Millennium Plan is ever allowed to see these documents) designed by Milliman based on ever so slight manipulations of the insurance companies' life insurance projections into which the "participants" are placed in an attempt to create the impression that insurance-company-like classes have been created. (Of course, this is a fiction because the people who put the money in want – and are told – they will receive an individualized accounting of *their* money. Until 2007 when the IRS began investigating Millennium, the participants' "Life Benefits and Death Benefits" were calculated based on the death benefit and cash values of their individual life insurance policies "owned" by the Millennium Plan).

5.28    As one would expect, the IRS recognized the Millennium Plan was being used as a fraudulent device and so it has commenced an investigation of Barrow, Bevan and Ridge under 26 USC §6700, "Promoting abusive tax shelters." The potential fine is $1,000.00 for each interest sold, in this case $541,000.00. Of course the "participants", like Plaintiffs, are deemed to have invested in an 'abusive tax shelter" and are incurring hundreds of thousands of dollars in penalties.

5.29    In practice, the Defendants use the Millennium Plan/RICO enterprise to commit **mail** and **wire** fraud like this:

a)      Bevan and/or Ridge solicit, by **mail and interstate telephone calls**, insurance agents, CPA's, lawyers or financial advisors to attend a one day "Millennium University";

b)      the attendees are given a slide show which describes the Millennium Plan as a bona fide §419A(f)(6) plan, *but* contains numerous graphs and tables showing the "investment" value of the "tax free" contribution, advising against the use of the word "premium," illustrating fantastic "growth rates" for the contributions and listing highly inflated death benefits.  (This is particularly deceptive in light of the fact that the Millennium Plan has reduced $300 million in contributions to $100 million in cash values);

c)      The salesmen are told that, while certain words of art should be employed – like "welfare benefit plan" – the emphasis is to be placed on "tax advantages," "growth rates," "living benefits" and "employment severance benefits," i.e., retirement.  The salesmen are given *carte blanche* to present the Millennium Plan as an investment vehicle which, of course, it isn't.  It is at this juncture that the real deal shines through to the initiated.  If this was a §419A(f)(6) plan, why is the participant signing an illustration showing how his policy will "perform?"  Why is he being shown charts and graphs demonstrating how superior his "pre-tax contributions" will "grow" compared to an after tax "investment?"  Why is he being told he can convert to an individual plan that "he controls?"  The reasons – it is presented as a legitimate tax advantaged investment;

d)      The salesmen then contact small business owners they know that have money.  This first contact is almost always either directly or indirectly initiated by a lawyer/CPA/financial advisor who attended one of the "Millennium Universities" or, is acquaintanced with an insurance salesman who has attended and promises to share commissions for introductions that result in successful sales.   These people introduce the insurance salesmen to the victims.  The Millennium Plan is described as a tax free investment retirement vehicle with the added benefit of free insurance.  An insurance application is taken, various documents are signed, a check obtained for the "first contribution" – which, coincidently is within a few dollars of the initial premium for the whole life policy – and the

salesman disappears;

e)      The salesman – in Plaintiffs' case Arch Bonnema and Jacob Bonnema – then **mails** the documents to Bevan/Millennium Marketing Group who then **mails** the application to the insurance company, in this case The Guardian Life Insurance Company of America ("Guardian");

f)      The insurance company gets a physical from the "participant" and informs SecurePlan/Bevan that it is ready to issue.  Bevan then has SecurePlan (the TPA) **mail** a check to the insurance company who then **mails** the policy to the "owner" who is the trustee – the insured who pays the premium never sees the policy.  This is all by Bevan/Ridge's design.  See **Exhibit 5**, the step by step procedure the salesmen are told to follow.  They don't send the Master Plan to the participant until *after* they get the first year's (or two or three quarterly) payments on the premium because they don't want the "participant" to know what they are "participating" in until the money is in the hands of the insurance company and Bevan and the salesman have received their commission. The insureds never get the insurance policy and are never told that 100% of their money was used to purchase life insurance;

g)      Several months after the policy is issued, Defendant Millennium Marketing Group, LLC, (Bevan/Ridge company) *might* send a large notebook, called an "Administrative Manual," to the "participant" which details all the duties of an ERISA plan administrator and contains the 32-page Master Plan along with dozens of other documents purporting to legitimize the Millennium Plan.  Most of these documents were drafted by Barrow and are all designed to make it look like the Millennium Plan complies with all of the "complicated" Internal Revenue Code provisions applicable to the "investment."  Bearing in mind that the target victims are small business owners

who run a business, Defendants quite reasonably anticipate that the more voluminous, technical and complex the document package, the less likely a working person is to read it. They are consistently correct. In addition, most of the disclaimer information is hidden away on a CD which is tucked inside the notebook;

h)      Typically, no one discovers the scam until they have put money into the plan for the two to five years they expected and then – the *next* year they get an unexpected bill, or they get a call from the seemingly frantic agent who tells them if they don't keep paying they will lose all their money and if they thought otherwise they must have misunderstood. It is at this point that some begin demanding their money back, some sue, and some mortgage their home to make more "contributions" trying to keep from losing *all* their money; and

i)      From the inception of the "plan", Defendants Barrow, Bevan and Ridge ran every aspect of it. There was no plan committee and no intention to form one – unless the IRS or Department of Labor began an investigation, or the "participants" began to sue. Which of course is what happened. From November 2002 until mid-2004 there was no plan committee. In 2004, the DOL began investigating the "plan" and in the process interviewed Barrow who thereafter, with the assistance of another attorney, Ted Scallet, advised Bevan and Ridge to form a "Plan Committee" and they then instructed BKD to begin solicitation of "plan committee members." See **Exhibit 6**.

5.30    Millennium Plan is the joint invention of Defendants Bevan and Ridge who conspired to devise the plan in 2000. Both had previously sold interest in other bogus plans and decided to form their own "plan" to make more money. They needed a lawyer to write the "plan documents" and hired Defendant Barrow to do so in 2001. In late 2001, Barrow began drafting the plan documents. The final document was completed in mid-2002. From this point, Bevan and Ridge began to sell interest in "The Millennium Plan."

5.31    Bevan owns Innovus and Millennium Marketing Group ("MMG").  Scott Ridge owns Ridge Insurance.  Bevan takes commissions through Innovus and uses MMG as the entity through which he contracts with salesmen to "market" the Millennium Plan.  The Ridges use Ridge Insurance to receive commissions and also to "market" the Millennium Plan.

5.32    There are three formation documents:  1) the Master Plan; 2) the Trust Agreement; and 3) the Adoption Agreement.  The Master Plan describes the arrangement as a §419A(f)(6) plan but includes provisions purporting to give the participant the option of converting the plan to an individual plan or some other arrangement from which the money can be withdrawn.  This is necessary to convince people to put money into the plan, but, of course, is one reason why it is not a bona fide §419A(f)(6) plan.  It provides that the plan is to be controlled by a Plan Committee comprised of "employers" who determine annually how much money the participants will receive from the plan and has language purporting to make it an ERISA plan.  It is not an ERISA plan.  An ERISA multiple employer plan must be comprised of employers with a commonality of interest, like a trade association; the Millennium Plan participants have no such common interest.

5.33    The Trust Agreement provides for a trustee who holds the "assets" (i.e., insurance policies).  The Adoption Agreement has obfuscatory language which attempts to create the illusion of a real ERISA plan.  These three documents were jointly drafted by Barrow, Bevan and Ridge.

## VI.

## VIOLATIONS OF THE MAIL AND WIRE FRAUD STATUTES SPECIFIC TO PLAINTIFFS

**A.    Mail and Wire Fraud Statutes.**

6.01    18 USC §1341, "Frauds and Swindles" provides that it is a violation of the statute to

use the mail to commit fraud.

6.02    The Wire Fraud Statute, 18 USC §1343 "Fraud by Wire, Radio or Television" provides that it is a violation of the statute if anyone transmits or causes to be transmitted by means of wire (**which includes telephone or internet**) any communication for the purpose of executing a scheme or artifice to defraud.

**B.    Bonnema/Bevan/Ridge/Barrow Use of the Millennium Plan as a RICO Enterprise.**

6.03    At various times during the last quarter of 2003 the Defendants Arch Bonnema and Jacob Bonnema came to Plaintiffs' place of business to solicit his participation in what they represented to be a "retirement plan."  The Bonnemas were introduced to Plaintiff Renwick through a friend of Plaintiff Renwick with whom he plays tennis.

6.04    The Bonnema Defendants arranged these meetings with Plaintiff Renwick by **telephone**.  Over the course of two to four meetings, the Bonnema Defendants represented to Plaintiff Renwick that the Millennium Plan was a "savings/retirement plan" into which he could deposit money in any amounts he desired for any period of time he desired.  The Bonnemas represented that the Millennium Plan was an investment account and that Plaintiffs' money would accumulate interest and earn other accumulations by way of being invested by the controllers of the Millennium Plan.  The Bonnemas told Plaintiffs that the money would be deposited with Guardian who would act much like a bank in managing the investment.

6.05    Plaintiff Renwick informed the Bonnema Defendants that he wanted to make deposits for approximately five years in the amount of $50,000.00 per year.  The Bonnema Defendants told him that was permissible under the "plan" and that, as an added benefit of the investment, he was going to receive "free life insurance" from Guardian which was a necessary element of the transaction in order to achieve the tax benefits and allow Guardian to manage the investment itself.

6.06     Plaintiff Renwick was instructed to sign an Adoption Agreement which he was told was necessary to institute the investment program and on November 12, 2003, Renwick executed the "Adoption Agreement" at the Bonnema Defendants' instruction and wrote a check for $12,500.00 made out to Millennium Marketing Group, LLC, and an additional check for $1,066.84 which he was told was the amount necessary for "administrative fees." The Adoption Agreement and the checks were given to the Bonnema Defendants who, on some date unknown to Plaintiffs during the last quarter of 2003, **mailed** the Adoption Agreement and the checks to Defendant Bevan's company, Millennium Marketing Group, LLC, located in Houston, Texas. Part of every fraud victim's payment goes to Innovus, Bevan's corporation, or directly to Bevan as his share of the insurance commission. Bevan and Innovus are licensed as agents of Guardian in order to facilitate the direct payment of commissions to them. The referenced acts of the Bonnemas were done in their capacity as agents for Bevan/Millennium Marketing Group, LLC, Innovus and the Millennium Plan and in the scope of that agency with actual, apparent and implied authority.

6.07     Upon receipt of the Adoption Agreement and checks from Plaintiffs, Defendants Millennium Marketing Group, LLC/Bevan/Innovus **mailed** the checks to the purported plan Trustee, Republic Bank and Trust. These documents were **mailed** from Houston, Texas, to SecurePlan Administrators, L.L.C., Third Party Administrator, P. O. Box 5369, Norman, Oklahoma 73070, which is also the location of the office of Republic Bank and Trust. The initial check was dated November 22, 2003, for $2,500.00 and another check was dated December 10, 2003, for $12,500.00.

6.08     Thereafter, Defendants **mailed** the following items in furtherance of the conspiracy to defraud and as a means of operating the RICO enterprise:

6.09     The Bonnemas **mailed** Bevan Plaintiffs' check for $2,500.00 shortly after November

22, 2003.  Shortly thereafter, Bevan **mailed** to Defendant Republic Bank the check for $2,500.00.

6.10    The Bonnemas **mailed** to Bevan Plaintiffs' check for $12,500.00 shortly after December 10, 2003.  Shortly thereafter, Bevan **mailed** to Defendant Republic Bank the check for $12,500.00.

6.11    On December 26, 2003, Plaintiffs **mailed** to Defendant Republic Bank a check for $12,500.00 in response to Defendants' **mailed** invoice.

6.12    On February 24, 2004, Plaintiffs **mailed** to Defendant Republic Bank a check for $566.84 in response to Defendant SecurePlan's invoice **mailed** to Plaintiffs.

6.13    On or about March 17, 2004, an employee with the Defendant Innovus **mailed** to Defendant BKD a package of materials which included Plaintiff Renwick's Guardian life insurance application.

6.14    On April 28, 2004, Plaintiffs **mailed** to Defendant BKD a check for $13,120.34 in response to Defendant BKD's **mailed** invoice.

6.15    On or about June 28, 2004, Defendant BKD **mailed** to Defendant Barrow copies of the Millennium Plan Adoption Agreement which was signed by Plaintiffs and originally **mailed** to BKD by the Bonnema Defendants.

6.16    On August 13, 2004, the Defendant Millennium Marketing Group **mailed** to Plaintiffs an invoice for $2,500.00 purportedly for "annual administration fee for 2004."

6.17    On November 10, 2004, Plaintiffs **mailed** to Defendant BKD a check for $12,810.64 in response to Defendant BKD's **mailed** invoice.

6.18    At the time Plaintiffs were induced to enter into the "plan" Defendant BKD, LLP was the so-called Third Party Administrator of the Millennium Plan.  On January 14, 2005, BKD **mailed**

to Plaintiffs an invoice stating the amount due from Plaintiffs to the plan was $13,129.34.

6.19    On February 10, 2005, Defendant Republic Bank and Trust sent by **interstate fax** to one Mark Watkins policy premium notices on Plaintiff Renwick.

6.20    On February 25, 2005, Defendant BKD **mailed** to Defendant Bevan, Ridge and Barrow spread sheets which included information on the "contributions" paid by Plaintiff Renwick.

6.21    On March 4, 2005, Plaintiffs **mailed** to Defendant BKD a check for $13,129.34 in response to Defendant BKD's **mailed** invoice.

6.22    On April 1, 2005, Defendant BKD **mailed** an invoice to Plaintiffs for $13,129.34 purportedly for Plaintiffs' "quarterly contribution to the plan."

6.23    On April 25, 2005, Defendant Barrow **mailed** to Plaintiff Renwick a "Millennium Memorandum" informing him that the Millennium Plan had changed Third Party Administrators from BKD to Defendant Republic.


6.24    On April 28, 2005, Defendant Millennium Marketing Group **mailed** to Plaintiff Renwick a letter returning one of his checks for $2,500.00 and asking him to make it payable to Defendant Millennium Marketing Group.

6.25    On May 11, 2005, Plaintiffs **mailed** to Defendant Millennium Marketing Group a check for $2,600.00 in response to Defendants' **mailed** invoice.

6.26    On May 18, 2005, Defendant Barrow **mailed** and/or **faxed** by **interstate wire** to Guardian a memo which detailed that the Bonnema Defendants had been making misrepresentations about the so-called Millennium Plan and that misrepresentations about the plan had been made by the Bonnemas to Plaintiffs.

6.27    On June 20, 2005, Defendant Millennium Plan **mailed** Plaintiffs a letter captioned "Important Announcement" informing them that the Third Party Administrator had been changed from BKD to Defendant SecurePlan.

6.28    The Millennium Plan thereafter changed Third Party Administrators to Defendant SecurePlan, located in Norman, Oklahoma.  On July 15, 2005, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $2,500.00 alleging that this amount was for "administrative dues."

6.29    On July 29, 2005, in response to a **mailed** invoice from Defendant Republic Bank and Trust, Plaintiffs had the Frost National Bank **wire** transfer $25,750.00 to the account of the Millennium Plan.

6.30    On October 26, 2005, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00 purportedly for "contributions to the plan."

6.31    On November 16, 2005, Defendant Millennium Marketing Group **mailed** to Plaintiffs a letter informing Plaintiffs that Defendant Millennium Marketing Group had informed Guardian that Plaintiffs had been defrauded in participating in the so-called Millennium Plan and this letter goes on to describe the limited "adjustments" Guardian supposedly agreed to make in the policy on Plaintiff Renwick's life.  Although this purported to be some special concession that Barrow had worked out with Guardian, the "adjustments" were nothing more than what any policowner could request under the terms of the police and in fact Barow had not obtained any special concession from Guardian and had no authorty whatsoever to speak on their behalf.

6.32    On November 16, 2005, Defendant Millennium Marketing Group **mailed** to Plaintiffs a letter purporting to describe the limited "adjustments" that Millennium Marketing Group and Guardian were willing to make to Plaintiffs' "participation" in light of the fact they had admitted

Plaintiffs had been defrauded into "contributing" to the plan.

6.33     On December 16, 2005, Defendant Barrow **emailed** to Defendant Innovus a communication requesting that an Innovus employee "pull" Plaintiffs' file for Defendant Barrow's review.

6.34     On January 25, 2006, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00 purportedly for "contributions to the plan."

6.35     On March 6, 2006, Plaintiffs **mailed** to Defendant SecurePlan a check for $12,875.00 in response to Defendants' **mailed** invoice.

6.36     On April 12, 2006, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00 purportedly for "quarterly contribution to the plan."

6.37     On June 3, 2006, Plaintiffs **mailed** to Defendant SecurePlan a check for $12,875.00 in response to Defendants' **mailed** invoice.


6.38     On June 15, 2006, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $2,500.00 purportedly for "annual administration fee."

6.39     On July 12, 2006, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00 purportedly  for "your quarterly contribution to the plan."

6.40     On August 11, 2006, Plaintiffs **mailed** to Defendant SecurePlan a check for $12,875.00 in response to Defendants**' mailed** invoice.

6.41     On September 14, 2006, Plaintiffs **mailed** to Defendant SecurePlan a check for $12,129.34 in response to Defendant BKD's **mailed** invoice.

6.42     On October 12, 2006, Defendant SecurePlan **mailed** to Plaintiffs an invoice for

$12,875.00 purportedly for "your quarterly contribution to the plan."

6.43    On November 13, 2006, Plaintiffs **mailed** to Defendant SecurePlan a check for $12,875.00 in response to Defendants' **mailed** invoice.

6.44    On November 14, 2006,  Plaintiffs **mailed** to Defendant SecurePlan a check for $12,575.00 in response to Defendants' **mailed** invoice.

6.45    On January 12, 2007, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00 purportedly for "your quarterly contribution to the plan."

6.46    On February 13, 2007, Plaintiffs **mailed** to Defendant SecurePlan a check for $12,875.00 in response to Defendants' **mailed** invoice.

6.46    On April 23, 2007, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00 for a "quarterly contribution."

6.47    On July 12, 2007, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00 for a "quarterly contribution."

6.48    On July 23, 2007, Plaintiffs wrote a letter to Defendants Millennium Plan and SecurePlan informing them that he wanted his money refunded.

6.49    On July 24, 2007, Defendant Millennium Marketing Group **mailed** to Plaintiffs a letter stating that his participation would be "voided."

6.50    On October 15, 2007, Defendant Millennium Plan **mailed** to Plaintiffs an invoice for $38,625.00 demanding payment by November 15, 2007.

6.51    On October 15, 2007, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00.

6.52    On January 4, 2008, Plaintiffs sent Defendant Millennium Marketing Group the

$1,000.00 they had requested as a "fee" to void the transaction.

6.53    On January 16, 2008, Defendant Millennium Plan **mailed** to Plaintiffs an invoice for $51,500.00.

6.54    On January 16, 2008, Defendant SecurePlan **mailed** to Plaintiffs an invoice for $12,875.00.

6.55    On January 28, 2008, Defendant Millennium Marketing Group **mailed** to Plaintiffs a letter informing them that the transaction would not be rescinded.

6.56    On February 7, 2008, Defendant Millennium Plan **mailed** to Plaintiffs a letter informing them that their money would not be refunded.

6.57    On March 17, 2008, Defendant Millennium Plan **mailed** to Plaintiffs a letter demanding a $51,000.00 payment and threatening "forfeiture" of Plaintiffs' money.

6.58    All of these **mailed** items were necessary to, and intended to, accomplish fraud.


**C.    The role of insurance in the RICO Enterprise**.

6.59    Whole life policies are among the most profitable insurance products for insurance agents to sell.  This is because they made commissions of 90% to 100% for the first year.  These commissions make whole life policies a very poor investment choice since all of the money deposited in the first year is generally paid to the agent.  Thus, these policies are ussually hard to sell absent some gimmick.  The gimmick here was the Millennium Plan.

6.60    Scam 419 plans in existence in 2001 operated *just like* the Millennium Plan – the only difference was that the Millennium Plan documents used words of art which, the conspirators felt, would give them a basis for plausible deniability in litigation.  The marketing tactics remained the

same – if a person wanted a retirement plan, it was a retirement plan, if they wanted an education savings plan, that's what it was, if they were more interested in medical benefits, the salesman morphed it into a tax deductible health insurance plan. But in reality it was nothing more than a gimmick used to sell large whole life insurance policies.

6.61    The fact that the Millennium Plan is really an insurance sales gimmick is further supported by the following facts:

1)    the Millennium Plan was formed by *insurance* salesmen to sell *insurance* and the only thing they are really selling to the fraud victims is *insurance* and every dime the victims put into the "plan" is for an *insurance* and related "administrative fees" paid to the co-conspirators. How many MEWA's require participants to contribute to a legal defense fund? The answer is: all of the bogus ones like the Millennium Plan and none of the legitimate ones. At the inception of the Millennium Plan, Bevan, Ridge and Barrow knew they would be sued and that it was likely the IRS would prosecute a §6700 audit – so they got the "participants" to front their legal fees by these contributions to the "legal defense fund" which is – as this is being written – paying Bevan's and Barrow's defense bills in a §6700 audit, courtesy of the people they defrauded.

2)    The new IRS rules were designed to shut down 419A plans devised and run by *insurance* salesmen.

3)    If "the plan" is buying the policy, why is the *insurance* salesman meeting with the insurance applicant?

4)    If "the plan" is buying the policy, why does the insurance agent NEVER meet with the trustee of the plan or anyone else for the plan to discuss the policy, the cost, the amount applied for or any of the other relevant factors?

5)    If "the plan" is buying the policy, why is the insured – who is paying the money –

asked to sign an illustration showing how much their money will purport to grow over time?  Since there cannot be any individual identification of funds in a bona fide 419A(f)(6) plan, why is an i*nsurance* agent meeting with an *insurance* applicant about having an *insurance* policy issued on his life? Legitimate 419A(f)(6) plans can be funded with insurance, but not individual insurance issued on an individual life with individual accounting to that insured for his individual payments into the policy.  In a legitimate plan, a group of 10 or more employers put money in a plan, designate the classes of employees who will be participating and the types of benefits which will be provided then the *administrator* meets with insurance agents to buy a policy – for the plan – to provide the benefits.  Just like a group health policy – in a legitimate plan there is no individual underwriting.  In a legitimate plan, underwriting information is obtained from individuals to quote a premium for *the group* of employees.


6)      If "the plan" was buying the policy, why didn't the insurance salesman meet with a representative  of "the plan" and obtain group underwriting information?  This never happened.  7)

"The Plan" is a scheme to sell insurance.  No one can get into the plan *unless* they **first buy an insurance policy**.  If an insurance company doesn't issue a policy, then the "participant" can't participate.  **This is the single most important fact which proves Defendants were using the Millennium Plan as a RICO enterprise to sell insurance**.  The Millennium Plan would not exist but for the insurance companies willingness to issue policies to the plan.  No one can participate in the plan without first buying an individually underwritten life policy from an insurance agent.  There is no legitimate 419A(f)(6) plan that has that as a condition precedent.   Every Defendant knew it.

8)      Defendants now claim that the insurance is not sold  to individuals but to "the plan."

If that is so, why does the insurance company lapse the policy for failure to pay *premiums* when the insureds stop paying *"contributions"* into the plan?  If there is cash value in the policy when the "participants" stop paying "contributions," why does the Millennium Plan (a/k/a Bevan, Ridge and Cocks) to cash in the policy and keep the money?  If this is a 419A(f)(6) plan, why does the cessation of a person's "contributions" result in the forfeiture of *that person's* life insurance policy when §419A prohibits individualized accounting?  Because it's nothing more than an insurance wolf in MEWA sheep's clothing.  It's an insurance sales scheme and Defendants use it to sell insurance and defraud the "plan participants".

9)      If this is a bona fide 419A plan not sold as an "investment" vehicle, why does the insurance company require the agent to give the whole life *individually underwritten insurance applicant* a "policy illustration" just like the agent would any other man-off-the-street showing how much the policy will be worth if – God willing – you can pay premiums until you are 96.  Not 95, not 97 – 96.  The Guardian policy issued on Plaintiff Renwick's life requires payments until the age of **96** to realize the fantastic growth potential of this unique investment opportunity.[3]

10)      When the insurance agents attend the Millennium University, they learn how to deceive a person into unintentionally buying a whole life policy when they thought they were putting money in an interest bearing, tax advantaged investment.  That's the purpose of it and all the Defendants know it.  If this was not the fact, why would the Millennium University slide show instruct the insurance agents about how to compare the "Millennium Plan contribution" to a stock market investment?  The only reason is because the Millennium Plan is presented as a tax advantaged investment.

---

[3]Less than 1% of the population lives to age 96.

11)     Every "*participant" is a small business owner*.  There are no rank and file employees in the Millennium Plan.  **This is the second most important fact proving that Defendants were using the Millennium Plan as a RICO enterprise**.  MEWA's are for employees, not owners.  Owners put money in it because they are told it's a retirement or savings plan.

### D.     Defendant Cock's Use of the RICO Enterprise.

6.62     Jonathan Cocks was a small time accountant working out of his home before his acquaintance with Bevan/Barrow.  In 2003 an *insurance salesman* named Cooley approached one of Cocks' few clients about buying in to the Millennium Plan and, fortuitously, the client asked Cocks to attend the meeting.  Prior to this meeting, Cocks had never heard of a 419 plan but Cooley persuaded him and his client it was a "good investment" and his client, David Cunningham, obligated himself to pay an unknown amount of money into the Millennium Plan.  The next year – mid-2004 – is when Bevan/Barrow/Ridge began their attempts (unsuccessful as it turned out) to persuade the DOL that the Millennium Plan was a bona fide ERISA plan (it isn't, see below).

6.63     Bevan/Barrow/Ridge knew of course that a real ERISA plan is controlled by employers – not insurance salesmen – and, from the Millennium Plan's inception in 2002 until mid-2004, Bevan and Ridge had run the plan.  The snow job on the DOL required creation of the appearance of propriety so Bevan/Barrow began asking people they knew they could control if they wanted to be "Plan Committee Members."  One of their solicitees was Jonathan Cocks, participant Cunningham's accountant.  Cocks accepted because Cunningham was paying for his time and he was otherwise not gainfully employed.   At this time, the so-called committee was a Bevan/Ridge/Barrow rubber stamp because they controlled all the information and "action items" upon which the toothless "Plan Committee" was called upon for decision.

6.64    In mid-2007, Cocks suggested he become the "Plan Committee Chairman" since he didn't have much work as a CPA.  At this time there were three people on the Plan Committee besides Cocks – all of whom had full-time jobs running their own businesses.  Cocks suggested that, since there was $100 million worth of insurance in the fund, an appropriate salary would be $400,000 annually.  Two of the Committee Members consented and one – who later resigned because his advice was ignored – objected.  This was, and is, the best job Cocks has ever had and he now has a lucrative, vested interest in perpetuating the myth that the Millennium Plan is an actual 419A plan.  For this purpose, he has committed numerous acts of **mail** fraud.

6.65    Unfortunately for the 500+ "participants" in the Millennium Plan, Cocks has obtained *carte blanche* access to the Millennium Plan's funds.  He obtained this position in the following manner:


a)      the Millennium Plan Master Document provides for a "Plan Committee" because ERISA requires that a bona fide plan of this nature be controlled by the employers who put money in it;

b)      Bevan/Barrow/Ridge ignored this provision until the DOL began investigating the plan and attorney Ted Scallet advised them to create a Plan Committee as a shill so that they could claim that the employers controlled the Millennium Plan when in fact they all knew that this was not true;

c)      when the DOL investigation required Bevan/Barrow/Ridge to masquerade the Millennium Plan as an ERISA plan, they hand picked "participants" with whom they had some rapport.  When it became obvious that Cocks was their man and would blindly do as Bevan, Ridge and Barrow suggested, they encouraged Cocks to become the "Plan Committee Chairman" where he

could make more money than he ever hoped to make as an accountant working from home.  Because of the financial incentive, Cocks was more than willing to do or say anything necessary to keep the plan alive so he could keep drawing his paycheck;

d)       there are 541 plan participants and only six or eight – including Cocks – have ever volunteered to be on the Plan Committee.  Two factors are at play.  One, people are too busy and, two, the potential liability is daunting to the average businessman.  Not so to Cocks.  He has no assets to speak of anyway and Bevan/Ridge are paying for a $5 million E&O policy from AIG which is coming out of the "plan participants'" pockets.  So Cocks is making $400,000 per year (plus expenses), has a $5 million liability policy and can't be levied on for anything over that because he has no assets;


e)       Unfortunately for all who have money in the Millennium Plan, Cocks' ascension to the Plan Committee and the chairmanship of the Plan Committee coincided with Bevan's/Barrow's hiring of The Groom Law Firm and in particular one Mr. Ted Scallet who is billing "the plan", i.e., the fraud victims, $640.00 per hour to, along with Mr. Cocks, perpetuate the myth at all costs (since the "participants" are paying all the costs and, for the most part, have no idea what is going on).  Mr. Cocks and Mr. Scallet have formed a symbiotic relationship whereby Cocks approves all of Scallet's bills and Scallet files every suit and motion known to the law in order to prolong the Millennium Plan's inevitable demise so that Scallet and Cocks can milk every last dime from the "participants" before the RICO enterprise is finally shut down;

f)       Scallet/Cocks control all the information disseminated to the victims so the fiction can continue *ad nauseum*.  For example, on October 5, 2007, the IRS issued its Letter Ruling, the substance of which is stated in **Exhibit 2** and Scallet/Cocks concocted the letter attached as **Exhibit**

**7** which Cocks **mailed** to all participants explaining why they couldn't send the letter to the Millennium Plan victims so they wouldn't know they were about to get hit with $300,000 penalties for participating in the Millennium Plan.

g)      Scallet/Cocks are making hundreds of thousands of dollars annually by concealing the fraud and filing frivolous lawsuits and groundless motions.  At this juncture, Scallet has not been sued for his participation in the RICO enterprise and Cocks is judgment proof.

6.66    Cocks has committed **mail fraud** in the following particulars:

1)      Cocks had numerous **interstate telephone calls** with Millennium Plan members all across the United States.  In these telephone conversations, Cocks discussed various issues including certain participants' refund requests and the purported status of the Millennium Plan's fight with the IRS.  Cock's concealed purpose was to deceive these plan participants into believing 1) the Millennium Plan RICO enterprise was a bona fide employee welfare benefit plan; and 2) based on his experience, knowledge and research as a CPA, the Millennium Plan would prevail in its litigation against the IRS and establish its legitimacy.  Cocks' purpose was to ensure that the Millennium Plan continued as an ongoing RICO enterprise so he could continue to profit from the fraud.  Cocks has also refused to provide plan members with a copy of the IRS Letter Ruling claiming that if it was disseminated among the plan participants, it would jeopardize the Millennium Plan's position regarding the deductibility of contributions and by claiming that a Court had ordered it not be circulated.  These statements were false.  Cocks did not want the Letter Ruling sent to plan participants because he knew when they found out they were subject to $300,000 per year penalties three things would happen:  1) the participants would demand their money back *en masse*; 2) virtually everyone would stop putting money in the plan; and 3) the RICO enterprise would collapse and Cocks would lose his $400,000 per year job.  Cocks has said and done everything imaginable to

prevent the participants from seeing the Letter Ruling, including engaging in **mail fraud** as detailed below;

2)      On October 15, 2007, Cocks **mailed** a letter to all participants informing them an unfavorable Letter Ruling had been issued by the IRS and that he would send them a "summary" of the ruling.  Cocks said in the letter that the ruling was "unfavorable" and held the Millennium Plan was a listed transaction.  But he also told them the Letter Ruling was *inadmissible* in evidence, which of course is not true.  What Cocks should have told the participants is that they had been defrauded and then list the reasons (all of which are detailed elsewhere in this Complaint) why the Millennium Plan was not an even remotely defensible 419A plan.  He did not, has not and will not reveal the truth to the Plan participants because he, like the other Defendants, is using the Millennium Plan as a RICO enterprise;

3)      On November 15, 2007, Cocks **mailed** another letter to all participants advising them to consult with an attorney about filing form 8886 which is notification of investment in a Listed Transaction.  In spite of Cocks' knowledge about the true nature and purpose of the Millennium Plan, in this letter he continues to tell the plan members he and Millennium Marketing Group, LLC (Bevan) "strongly disagree" with the IRS;

4)      On December 19, 2007, Cocks **mailed** all plan members a letter mischaracterizing developments in the IRS litigation with the intent to create the impression that the Millennium Plan was the victim of IRS harassment (the real reason: the Millennium Plan is an insurance scam) and that Cocks and the Millennium Plan "advisors" were confident of prevailing.  Once again Cocks concealed the true nature of the plan and his false encouragement was solely intended to prevent a run on the bank.  In this letter Cocks also says he and the Plan Committee  decided not to send out

the Letter Ruling because that would be deemed "publishing" it and that this would negatively impact their position with the IRS. The Letter Ruling was devastatingly detrimental to every plan participant; many were being audited and/or having hundreds of thousands of dollars in penalties imposed, yet Cocks was concealing the contents of the Letter Ruling solely for the purpose of protecting his salary, which, by the way, was being paid by the people he was defrauding. Additionally, this letter informs participants that the "Legal Defense Fund" to which they had been contributing had hired a lawyer named Michael Lloyd – one of Barrow's friends – to represent them. Unbeknownst though to the participants, Lloyd assisted Barrow in setting up the Millennium Plan, has entered into a "419 Coalition with Barrow and another attorney that saw the Millennium Plan as a way to line his pockets, David Marcus, and these three lawyers intended to milk the Millennium Plan participants as well by continuing the fiction that the Millennium Plan was valid and would ultimately pass IRS muster. Lloyd then set up an **internet site** where for $500, he would prepare certain documents for plan participants to supposedly protect them from IRS penalties. This charge was imposed despite the fact that Lloyd was also part of the Legal Defense Fund that each plan participant paid into supposedly to provide them with legal assistance at "no charge" for this very service. Cocks referred all plan participants to Lloyd without revealing his conflicts and allowed Lloyd to charge fees for services which should have been provided free of charge as part of the Legal Defense Fund. Lloyd is equally committed to perpetuating the fiction regarding the purported legitimacy of the Millennium Plan.

5)      On January 14, 2008, Cocks **mailed** to the participants a letter encouraging them to write their congressman requesting that they, basically, repeal the laws the IRS uses to discover phony tax shelters. It ends with a friendly reminder that if anyone stops sending money, **all the**

**money they paid will be forfeited**.  This is more irrefutable evidence the Millennium Plan is a RICO enterprise – in a legitimate 419A plan, a cessation of payments results in discontinuance of participation in the plan; there is nothing to "forfeit," nothing for the plan to confiscate as Cocks threatens to do because a legitimate plan is not an investment.  All the plan participants were told *they* had an individualized account into which *their* money was deposited which would then grow at a fantastic rate.  It is the plan participants' *individual* accounts Cocks is threatening to seize.  And, in fact, Cocks/Bevan/Ridge have confiscated many of the life policies and cashed them in – the money goes almost exclusively to pay Cocks' salary and the enormous legal fees of Scallet, Barrow, Lloyd, Marcus and others.

6)      Cocks' next instance of **mail fraud** is connected to a correspondence chain commenced by Barrow.  On November 16, 2005, Barrow **mailed** Plaintiff a letter acknowledging the Bonnema Defendants defrauded Plaintiff and informing him that, while the Bonnemas said he could pay money in for five years, he really had to pay money for *forty-five years*!  But, not to worry, the Millennium Marketing Group, LLC (Bevan/Ridge) purportedly had it all worked out with Guardian such that Plaintiff could stay in the plan but his "benefits" would be sharply reduced.  This letter of course was a ploy.  Barrow says that the Bonnemas misinformed Plaintiff about how long he would have to pay in to the plan when Barrow knew that the Bonnemas told Plaintiff and many others exactly what Barrow/Bevan/Ridge/Millennium expected them to tell people, i.e., the Millennium Plan was a fantastic tax advantaged investment and, like any investment, the amount invested each year, if any, was up to the individual investor.  Barrow's letter implies Plaintiff understood he was contributing to a MEWA, but that he was misinformed about how long and how much he would have to contribute.  She knew this was not true.  Barrow was one of the presenters at

Millennium University where agents were told to tell prospects they could put money in the plan for "3, 5 or 10 years" – now in this letter she tells Plaintiff the Millennium Plan was "structured to require level contributions . . . until age 96." She goes on with two pages of senseless wanderings about "Rating Group Dynamics" and "Life Benefit scenarios", then ends with "Let me know which of the settlement options your participants prefer." Barrow is fully aware, of course, that there are no "participants" and that it's just Plaintiff, Malcolm Renwick, who was defrauded, but, like all the Defendants, she is attempting to perpetuate the MEWA myth because, at the time of this letter, she was employed by Bevan, and being paid more money than she had ever made in her life. Two months after the November 16, 2005, Barrow letter, Guardian mailed a letter to RBT that said it was disregarding the Barrow letter because she had no authority to speak for Guardian.

      7)      On July 23, 2007, Plaintiff wrote Dustin Lambert, who works for SecurePlan, and RBT, saying he wanted to withdraw from the Millennium Plan. In response, on July 24, 2007, Ms. Karen Shumate who works for Millennium Marketing Group, LLC, Innovus and Bevan, **mailed** Plaintiffs a letter saying that Millennium Marketing Group, LLC, would honor Plaintiffs' request and "void the transaction." if Plaintiff sent a $1,000.00 fee, which he did on January 4, 2008, after getting further clarification about what he needed to do. Then, on January 28, 2008, Shumate **mailed** Plaintiff a letter saying "the Plan Committee Chairman" (Cocks) told her to return Plaintiff's $1,000.00 check and the transaction **would not** be voided. On February 7, 2008, Cocks **mailed** a letter to Plaintiff saying the Millennium Plan would not void the transaction. This same scenario was played out with other plan participants who discovered the fraud and demanded return of their money. Barrow (Bevan's employee) is the seemingly helpful good cop who, when informed of these rogue Bonnema agents, was going to make it so that the member at least didn't have to put any more

money in, then even has Ms. Shumate write saying the transaction will be voided; then the bad cop Cocks steps in to confiscate all the money.  Barrow/Bevan point the finger at Cocks and Cocks points to the "Plan documents which Barrow/Bevan drafted."  All of the Defendants are acting in concert, reading from the same script and constantly communicating throughout this ruse to keep the shell game going and the participants completely confused about what happened to all their money.

**E.    Milliman's Use of the Millennium Plan as a RICO Enterprise.**

6.67    This Defendant was instrumental and indispensable to the success of the Millennium Plan as a RICO enterprise.  Milliman's motivation was the same as for all other Defendants – money.  That firm was paid hundreds of thousands of dollars to devise, and continually revise, actuarial "rating groups" which had to be bastardized from the data and tables used in a legitimate MEWA.  This is the purpose of the "rating groups:"

1.    The fundamental failing of bogus 419A plans is that they must use individualized accounting so that the fraud victim thinks they have an "investment account;"

2.    Millennium Plan victims are all told they will get their money back – with interest – so somehow, someone has to keep track of it;

3.    However, that's not how real 419A plans work.  In a real one, a true group exists and the plan itself actually buys insurance to cover the participants.  Bevan/Ridge/Barrow were caught in a predicament here;

4.    The scheme needed some form of disguise so when the IRS looked at it, it wouldn't be so painfully obvious it was a RICO enterprise and the conspirators would have a colorable basis for saying, "Well, we thought this complied with the regs."  Enter Milliman and "rating groups."  Although the conspirators characterize these rating groups as rocket science which only actuaries and insurance salesmen understand, they are nothing more than a list of plan members' names,

purportedly grouped by what the Milliman computer says are common characteristics – like non-smoking males between 55 - 60 years old.  When initially determining a plan member's Life Benefits and Death Benefits, Millennium simply took that individual's insurance policy cash values and projections, tweaked them a bit by adding an "actuarial fee" – part of Milliman's cut for helping legitimize the deal – and then spit out a slightly modified figure representing the investment returns purportedly available under the plan.  Milliman knew this was bogus.  Milliman is a global company with dozens of actuaries and lawyers on staff.  They knew they were being asked to devise a scheme that, hopefully, would fool the IRS into believing the plan members were subject to group underwriting/premium calculations when Milliman and every other conspirator knew that wasn't so.  As this RICO enterprise began its siege phase after the IRS Letter Ruling was issued and the 30-day letters started going out, Milliman and the other Defendants realized they had way too many "rating groups" (virtually every participant had their own group, commensurate with the necessity for individualized accounting) and now there are only four for the 500+ participants to give it more the shape of a real MEWA.  By trial time, there will probably be only one;

5.      This "rating group" slight of hand is necessitated because this is a fake 419A plan.  The conspirators' problems begin, of course, with the deceptions necessary to induce participation.  Imagine the reaction if the insurance salesman told the participant "you put $100,000.00 a year in this plan until you're 96 years old, the first $100,000.00 is my commission, you're paying for a whole life policy but you don't own it, and any money you get back is going to be determined by what rating group Milliman puts you in and how many people die or get sick that are in your group.  And, by the way, if you ever stop paying, the plan will confiscate *all* your money."  This is exactly how it works, but, quite obviously, not what the fraud victims are told;

6.      Bevan/Ridge conned their first fraud victim in mid to late 2002; now, seven years

later, 500+ people have been scammed out of about $300 million and the Defendants have spent/wasted/lost about $200 million of that. Milliman's participation, as it turns out, was part of the wasted money – here's why. None of the victims had any idea what a rating group was, or who Milliman is. Milliman's effort was directed toward deceiving the IRS but, as it turns out, the IRS wasn't fooled and all the money the fraud victims unwittingly poured down the Milliman rat hole was for naught.

6.68     Instances known to date of Milliman's direct or indirect use of the **mail** to commit fraud:

6.69     In or around April 2005 Milliman sent Defendant Barrow by **mail or interstate email transmission** the Milliman spreadsheet calculating the "Millennium life benefits" for 2005;

6.70     In or around May 2005 Millennium sent Defendant Barrow by **interstate mail or email transmission** a bill exceeding $150,000.00 for work on the Millennium Plan;

6.71     In or around October 2005, Milliman sent Defendant Barrow by **interstate mail or email transmission** Milliman's "whole life rating assignments";

6.72     On October 4, 2005, Milliman sent Barrow and Innovus by **interstate email transmission** a spreadsheet showing suggested rating group and benefit assignments for new Millennium Plan participants;

6.73     On October 20, 2005, Milliman sent Barrow and Innovus by **interstate email transmission** a list of recommended rating group assignments and benefits for participants transferring into the Millennium Plan;

6.74     On November 11, 2005, Milliman sent Barrow, Innovus and RBT by **interstate**

**email transmission** a request for approval of rating group and benefit assignments for select Millennium Plan participants;

6.75    On December 21, 2005, Milliman sent Barrow, Innovus and RBT by **interstate email transmission** a request for approval of rating group and benefit assignments for select Millennium Plan participants;

6.76    On July 21, 2006, Milliman **mailed** to Defendant Bevan an invoice for $58,333.89 for services Milliman performed for the Millennium Plan which included projections, a Plan peer review, peer review Stochastic Calculations, analysis of plan benefits in Texas, participant requests for discontinuance of contributions, reports of inforce policies as of December 31, 2005, pending certificates of participation, rating group inconsistencies with funding, preparing projections using plan cash to pay benefits and projections using case instead of loans, discussing economic benefit submission to the IRS, preparing benefit reports/tests for the IRS, reviewing rating group assignments for Barrow, preparing projections of the Millennium Plan for the IRS, changing projection assumptions and reviewing values, reviewing Plan Committee duties, conducting follow-up concerning files sent to the IRS, changing projections, and re-running projections with new assumptions.  All of these documents had previously been transmitted by Milliman by **mail or interstate email transmission** to one or more Defendants.

6.77    On February 22, 2007, Milliman **mailed** to Defendant Bevan an invoice for $13,865.00;

6.78    On March 22, 2007, Milliman **mailed** an invoice to Cocks for $15,583.75;

6.79    On April 23, 2007, Milliman **mailed** to Cocks an invoice for $13,606.25;

6.80    On April 30, 2007, Millennium **mailed** to Defendant Barrow a memorandum of

"Millennium Plan Benefits for 2007".  This memorandum states that Milliman's intention is to base each individuals's death benefit on that individual's life insurance policy;

6.81    On May 9, 2007, Milliman **mailed** a "memorandum" regarding proposed Millennium Plan's benefits;

6.82    The above referenced report links the "death benefits" to the death benefit for the corresponding life insurance policy, and admits that the benefits are based on the premiums paid by the individual participants and correspond with the face amount of their life insurance policies;

6.83    On May 10, 2007, Milliman sent by **interstate email transmission** a life benefit report;

6.84    On May 10, 2007, Milliman sent by **interstate email transmission** to Cocks, Barrow, Innovus & RBT a memorandum, report and appendices regarding 2007 Millennium Plan proposed benefits and report of comparisons of 2006 and 2007 rating group assignments and benefits;

6.85    On May 14, 2007, Milliman sent by **interstate email transmission** to Cocks the 2007 Millennium Plan benefits report;

6.86    On May 14, 2007, Milliman sent by **interstate email transmission** to Cocks revised appendices to the 2007 Millennium Plan benefits report which added additional plan  participants to the rating groups;

6.87    On May 17, 2007, Milliman **mailed** to Cocks an invoice for $33,830.00 for actuarial services Milliman performed for the Plan in February, March and April 2007;

6.88    On July 27, 2007, Milliman **mailed** to Cocks an invoice for $2,025.00 for actuarial services Milliman performed for the Plan in June 2007;

6.89    On August 9, 2007, a "projection of Millennium Plan" was **mailed** by Milliman to Jonathan Cocks.

6.90    On August 17, 2007, Milliman **mailed** to Cocks an invoice for $14,378.75 for services Milliman performed for the Millennium Plan in July 2007 which included conference calls and meetings with Bevan and Gregg Ridge;

6.91    On October 15, 2007, Milliman **mailed** to Cocks an invoice for $3,437.50 for services Milliman performed for the Millennium Plan which included estimating 2008 life benefits, considering insurance policy borrowing questions posed by Cocks, reviewing allocations of investment income among rating groups, and reconciling projections to Plan contributions;

6.92    In or around November 2007 Milliman sent to Cocks by **mail or interstate email transmission** a invoice for October 2007 in the amount of $3,075.00.

6.93    In or around December 2007 Milliman sent to Cocks by **mail or interstate email transmission** a invoice for November 2007 in the amount of $8,712.50.

6.94    On January 7, 2008, Milliman **mailed** to Cocks an invoice for $5,400.00 for services Milliman performed for the Millennium Plan in December 2007 which included and analysis of Peer Review Economic Values, an audit for non-transfer cases, and allocations of investment income;

6.95    Page 2 of this report says that this Defendant is relying, in part, on "policy account values" evidencing the Defendant recognized individual accounts were maintained for each participant. On page 7 of this report Milliman makes the statement that "the supporting insurance policy for each of these participants is projected separately." Additionally, the "plan contribution amounts are based on the contribution for $1,000.00 of insurance for the death benefit identifier of which the participant is a member," that "contributions are paid beginning on July 1 of the issue year

of the insurance policy," and that all participants "enter the plan with a supporting policy . . . ." Page 9 of the report states "there may be times when the plan releases a participant from the plan by unwinding the transactions for the participant, but these are ignored as they are expected to be minimal." This document proves that Milliman intentionally participated in the RICO enterprise and knew that it was nothing more than an insurance sales scheme;

6.96    On August 17, 2007, Milliman **mailed** an invoice to Cocks for $14,378.75;

6.97    On September 6, 2007, Milliman **mailed** a billable hours report to Jonathan Cocks;

6.98    On October 15, 2007, Milliman **mailed** an invoice for $3,437.50 to Jonathan Cocks for "actuarial services";

6.99    On December 19, 2007, Milliman **mailed** an invoice to Cocks for $11,787.50; and

6.100   On April 23, 2008, Milliman sent by **mail** a "live benefit determination of 2008" letter which frankly admits that "as discussed in previous communications, the four life benefit rating groups currently in use in the Millennium Plan were developed in 2005 in order to more closely meet the Internal Revenue Code Section 419 10% rule for qualification as a multiple employer welfare benefit plan."

## F.    BKD's and SecurePlan's Use of the RICO Enterprise.

6.101   BKD and SecurePlan had identical involvement in the conspiracy. BKD was the "third party administrator" (TPA) from January 2003 to June 2005 and SecurePlan began in July 2005 and is in that position presently; both engaged in extensive **mail fraud** since they are the entities which billed (**by mail**) and collected the money (**by mail**) from the fraud victims. Their instances of **mail fraud** are detailed in section VII-B above. Both of these entities are experienced

TPAs, both had top level management personnel who read the Millennium Plan formation documents, who were familiar with the IRS regulations, statutes and notices detailed above and who realized the Millennium Plan was nothing more than an insurance scam. Most, if not all, the **mailed** items from these entities reference the "Adoption Agreement" which makes it patently obvious this is an insurance scam because:

1.      The only "participants" shown in this so-called "agreement" are Plaintiff Malcolm Renwick and his P.C. A legitimate MEWA has *employees* as beneficiaries – that's why they're called *employee* welfare benefit plans. **Every policy sold in this scam was sold to husband-wife business owners, sole owners or two- or three-partner owners of a business**. There was **no sale** to an enterprise who bought into the plan for the rank and file, which is the purpose of a 419A plan. The so-called Adoption Agreement looks like it was drafted for a Teamsters collective bargaining agreement with Consolidated Freight when, in actuality, every Defendant knew it was intended to be presented to mom and pop businesses or sole proprietorships where the people had made some money they wanted to put away for retirement – like Malcolm Renwick. No one even shows up on the "classes of employees participating" section except the owners;

2.      The so-called Adoption Agreement is replete with self-serving disclaimers and intentionally false statements like the "Plan assets are not credited to the account of any particular employer." Of course BKD & SecurePlan (and every other Defendant) knew this was false because these two Defendants had the records/copies of the individually underwritten life insurance policies, kept individual accounting records of the contributions, kept records of the individual premium payments and *made the premium payments* on the individual policies. And if a participant quit paying contributions to the Millennium Plan, then the insurance policy on this participant's life was

forfeited by SecurePlan.  These were also the Defendants who actually confiscated participants' money when they found out they had been scammed and stopped paying;

3.      The so-called Adoption Agreement never once mentions that the "contributions" were being used to pay insurance premiums and BKD and SecurePlan were taking the people's money and paying *insurance premiums* with it when every Defendant knew and intended this to be concealed from the fraud victims;

4.      The so-called Adoption Agreement purports to acknowledge that the "employer" (i.e., fraud victim) received the Master Plan before paying any money but – again by design – no one was ever provided a Master Plan document until **after** BKD or SecurePlan sent the money to the insurance company and the policy had been issued.  No one got "the Plan" until they were in "the Plan" and that required issuance of a life insurance policy.

6.102   This last point is what makes these Defendants' conduct particularly egregious – they handled the money, received it by **mail** and **mailed** or **wired** it to the insurance companies with full knowledge that *none* of the plan documents ever revealed the "contributions" were nothing more than insurance premiums.

## G.     Concluding Summary of the Interaction Among the Defendants, Their Use of the RICO Enterprise and Commission of Mail and Wire Fraud.

6.103   **Bevan/Ridge/Barrow** – originally devised the Millennium Plan, **mailed** and **emailed** and caused to be **mailed** and **emailed**, hundreds of documents and had numerous **interstate telephone conversations** between each other and to all other Defendants in furtherance of the scheme.

6.104   **Milliman** – actuarial company who devised phoney rating groups to deceive IRS and participants, **mailed** and **emailed** hundreds of copies of rating group lists and information to

Bevan/Ridge/Barrow and Cocks along with dozens of invoices and items of correspondence;

6.105 **Cocks** – so-called "Plan Committee Chairman" who **mailed** or caused to be **mailed** hundreds of documents including many deceptive letters to insureds, and letters threatening to confiscate the insureds' policies and who took and assisted others in taking hundreds of thousands of dollars from insureds.   Cocks had numerous **interstate phone conversations** with the plan participants.

6.106 **Bonnemas** – the  agents who sold the Millennium Plan to Plaintiffs and many others.  These Defendants defrauded victims out of millions of dollars and made hundreds of thousands of dollars in commissions.  They **mailed** dozens of applications, "Adoption Agreements" and checks to Bevan and had **hundreds of interstate telephone calls** in furtherance of the conspiracy.

6.107 **BKD & SecurePlan** – the so-called "plan administrators" took in millions of dollars from victims, confiscated victims' money by cashing in their policies, sent out hundreds of bills for bogus "administrative fees" and exchanged hundreds of items of **correspondence** with the other Defendants in furtherance of the conspiracy.

6.108 **RBT** – the "trustee" who received by **mail** the victims' policies, **mailed** dozens of invoices to Cocks for monthly fees, received dozens of **mailed** checks for the fees from BKD and SecurePlan and who **mailed** Plaintiffs' (and other victims') insurance policies so the Defendants could confiscate the cash values.

## VII.

## CAUSES OF ACTION

**A.     Civil RICO – Wire and Mail Fraud.**

7.01     18 USC §1964(c) provides a private right of action for mandatory treble damages,

costs and attorney's fees to "any person injured in his business or property by reason of a violation of §1962(c) which makes it "unlawful for any person employed by or associated with" a RICO enterprise "to conduct or participate . . . in the conduct of such enterprises affairs through a pattern of racketeering activity" including "**mail fraud** and **wire fraud.**" §1961(1)(B), **mail fraud**, 18 USC 1341, and **wire fraud**, §1343, prohibit use of the **mails** or any **interstate wire transmission** for the purpose of implementing a scheme to defraud for the purpose of obtaining money.  All Defendants conspired to, and did, operate the Millennium Plan as a RICO enterprise to defraud Plaintiffs, and 500+ other victims, out of money by means of **mail** and **wire** fraud.  Every Defendant received a portion of all the money obtained from Plaintiffs by fraud through use of the Millennium Plan as a RICO enterprise.

7.02    Defendants, individually and in conspiracy with one another, are all RICO persons who violated RICO by engaging in (1) "racketeering activity," (2) conducted through a "pattern," (3) affecting an "enterprise," (4) impacting interstate foreign commerce.  Defendants violated 18 USC §1962(c), by conducting and participating in the conduct of the affairs of an enterprise (the Millennium Plan) that is engaged in or affects interstate commerce through a pattern of racketeering activity (mail and wire fraud) as alleged herein.  Defendants also violated 18 USC §1962(d) by conspiring as alleged herein to violate 18 USC §1962(c).  All of Defendants' predicate acts have a similar purpose - to deceive the investors and to sell large life insurance policies - all have similar victims, small mom and pop business owners, all have had similar results, the investment of substantial sums in what is purported to be a tax advantages investment vehicle but which in reality is nothing more than an entrepreneurial enterprise designed to conceal the sale of large life insurance policies.  The methods of commission of the fraud has been virtually identical and was scripted by

the principal participants in the fraudulent scheme.  Defendants' repeated and persistent use of interstate mail and wire transmission to commit and perpetuate their fraud is related in time and purpose, is continuing, threatens to continue indefinitely into the future and constitutes a pervasive "pattern" of racketeering activity.  Plaintiffs have been damaged in that they have lost all of the money they invested as a direct result of Defendants' violation of 18 USC §1962.   And it is this money that Plaintiffs lost that is used to invest in the insurance policies (and pay the insurance commissions thereon) that are then held by the RICO enterprise, the Millennium Plan, and which is then paid out to many of the other RICO participants as alleged herein.

7.03    Plaintiffs are entitled to recover mandatory treble damages, cost and attorney's fees under 18 USC §1964(c).  This Court should also order appropriate relief under 18 USC §1964(a).

**B.    Breach of Fiduciary Duty.**

7.04    Defendants owed Plaintiffs a fiduciary duty as a result of their position of trust as investment advisors.  The actions of the Defendants as described above constitute a breach of this fiduciary duty thereby causing Plaintiffs damage for which they sue.  Plaintiffs further sue all Defendants for disgorgement of all funds obtained as a result of the breach of fiduciary duties by Defendants and any of their agents or advisors as a result of their breach of fiduciary duty, as well as disgorgement of all profits or gains achieved by any Defendant from said funds.

7.05    Defendants also owed Plaintiffs a fiduciary duty as a result of their position of trust as the ones controlling Plaintiffs' funds.  In addition, the funds invested purported to be held in trust for the benefit of Plaintiffs.  Defendants have breached their duty of trust by self-dealing, using Plaintiffs' funds for their own benefit, failing to adequately or timely account to Plaintiffs for their funds, failing to put the interests of Plaintiffs first in the handling of said funds and otherwise in engaging in the conduct complained of herein.  Defendants are strictly liable for all losses suffered

by Plaintiffs as a result of Defendants' breach of their fiduciary duties all for which Plaintiffs sue. Plaintiffs also sue for disgorgement of all funds and gains therefrom.

### C.     Unjust Enrichment.

7.06     Defendants obtained funds and profits from the Plaintiffs by fraud perpetrated by the Defendants and the taking of undue advantage of the Plaintiffs in the manner described above. Defendants' conduct gives rise to a cause of action on behalf of Plaintiffs under the equitable remedy of unjust enrichment, which cause of action is hereby stated.

### D.     Money Had and Received.

7.07     Defendants obtained money from Plaintiffs which in equity and good conscience belongs to Plaintiffs.  Said actions of Defendants give rise to a cause of action on behalf of Plaintiffs under the equitable theory of money had and received, which cause of action is hereby stated.

### E.     Article 541.151, Texas Insurance Code Deceptive Trade Practices

7.08     The conduct of Defendants as alleged above are all in violation of statutory sections of the Texas Insurance Code thereby giving rise to a claim under Article 541.151 Tex. Ins. Code and the Deceptive Trade Practices Act ("DTPA").  Said violations are a producing cause of Plaintiffs' damages.  Specifically, Defendants' misrepresentations violate the Texas Insurance Code and DTPA in the following respects:

(a)     Defendants misrepresented the terms, benefits or advantages of the insurance in violation of Texas Insurance Code Article 541.051.

(b)     Defendants made, or directly or indirectly caused to be made, an assertion, representation or statement with respect to insurance that was untrue, deceptive or misleading in violation of Texas Insurance Code Article 541.052.

(c)     Defendants misrepresented a material fact in violation of Texas Insurance Code Article 541.061.

(d)     Defendants failed to state a material fact necessary to make other statements not

misleading, considering the circumstances under which the statements were made in violation of Texas Insurance Code Article 541.061.

(e)      Defendants made misrepresentations in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact in violation of Texas Insurance Code Article 541.061.

(f)      Defendants caused confusion as to the source, sponsorship, approval or certification of the investment in violation of DTPA §17.46(b)(2).

(g)      Defendants represented that the investment and their services had sponsorship, approval, characteristics, uses and benefits which they did not have in violation of DTPA §17.46(b)(5).

(h)      Defendants represented that the investment and their services were of a particular standard, quality or grade when they were not in violation of DTPA §17.50(b)(7).

(i)      Defendants failed to disclose information regarding the investment and their services which was known at the time with the intent of inducing Plaintiffs into a transaction in which they would not have entered had the information been disclosed in violation of DTPA §17.50(b)(24).

7.09     Plaintiffs further sue for trebling of these damages and allege that Defendants' misrepresentations as described herein were committed "knowingly," in that Defendants had actual awareness, at the time of the acts complained of, of the falsity, deception or unfairness of the conduct in question, thereby entitling the jury to award Plaintiffs three times their economic damages as additional damages under Article 541.152 of the Texas Insurance Code and DTPA §17.50, for which Plaintiffs sue.

7.10     Plaintiffs sue for reasonable and necessary attorneys' fees for the preparation and trial of this cause and any appeal therefrom pursuant to Article 541.152 of the Texas Insurance Code and DTPA §17.50(d), taking into consideration all relevant factors.

# VIII.

# REQUESTED RELIEF

8.01     Plaintiffs request Defendants to be cited to appear and answer and that they have

judgment for their damages, treble damages, punitive damages, costs, interest, attorney's fees, relief under 18 USC §1964(a) and any other relief to which they may show themselves entitled.

/s/ Anthony L. Vitullo
Anthony L. Vitullo
State Bar No. 20595500
FEE, SMITH, SHARP & VITULLO, LLP
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240
Telephone:     (972) 934-9100
Fax:     (972) 934-9200
lvitullo@feesmith.com


John L. Malesovas
State Bar No. 12857300
David H. Martin
State Bar No. 13057850
MALESOVAS & MARTIN
P. O. Box 1709
Waco, Texas 76703-1709
Telephone:     (254) 753-1777
Fax:     (254) 755-6400
john@malesovas.com
dmartin@malesovas.com

and

Collen A. Clark
State Bar No. 04309100
The Clark Firm
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone:  (214) 780-0500
Fax:  (214) 780-0501

**Attorneys for Plaintiffs**