6.70    The Guardian legal department management team – as expected – papered their trail to try and limit their liability with various memos **mailed** and **emailed** to agents with the following advice/directives:

1)    419A plans have historically been used to make people think they were investing in a tax free retirement plan and "extreme caution" must be used;

2)    the salesman is not supposed to sell "the plan," he is supposed to sell the policy *to the plan*;

3)    the insured is supposed to decide to participate in "the plan" based on the advice of a lawyer/CPA and the insurance salesman is supposed to obtain a written statement from the insured that he is buying into the plan based on what this lawyer/CPA told him and not what the insurance agent told him;

4)    Guardian "would never" issue to a 419 plan which the insured thought provided "retirement income;"

5)    Guardian's only role is to issue a life policy to a "trust;"

6)    Guardian does not evaluate the validity of any 419 plan; the insured's lawyer or CPA does that;

7)    Guardian "is not involved" in the Millennium University; and,

8)    Guardian only issues to 419 plans as an "accommodation" to the insured.

6.71    These memos are  written with several ignored elephants standing in the room, namely:

1)    the Millennium Plan was formed by *insurance* salesmen to sell *insurance* and the only thing they are selling to the fraud victims is *insurance* and every dime the victims put into the "plan" is for an *insurance* related cost and those are:

**PLAINTIFFS' FIRST AMENDED COMPLAINT - CIVIL RICO**                                          **PAGE 31**

a)     premiums;

b)     commissions;

c)     actuarial fees; and,

d)     legal defense fund fees to pay lawyers to defend the *insurance* salesman "plan sponsor" when the IRS opens a §6700 fraud audit.

How many MEWA's require participants to contribute to a legal defense fund?  The answer is:  all of the bogus ones like the Millennium Plan and none of the legitimate ones.  At the inception of the Millennium Plan, Bevan, Ridge and Barrow knew they would be sued and that it was likely the IRS would prosecute a §6700 audit – so they got the "participants" to front their legal fees by these contributions to the "legal defense fund" which is – as this is being written – paying Bevan's and Barrow's defense bills in a §6700 audit, courtesy of the people they defrauded.

2)     The new IRS rules were designed to shut down 419A plans devised and run by *insurance* salesmen.

3)     If "the plan" is buying the policy, why is the *insurance* salesman meeting with the insurance applicant?

4)     If "the plan" is buying the policy, why does the insurance agent NEVER meet with the trustee of the plan or anyone else for the plan to discuss the policy, the cost, the amount applied for or any of the other relevant factors?

5)     If "the plan" is buying the policy, why is the insured – who is paying the money – asked to sign an illustration showing how much their money will purport to grow over time?  Guardian's memos say they are issuing to "the plan" as an accommodation to the insureds' attorney/CPA who, the fiction goes, was convinced the Millennium Plan was the ideal investment for this client.  Since there cannot be any individual identification of funds in a bona fide 419A(f)(6)

plan, why is an *insurance* agent meeting with an *insurance* applicant about having an *insurance* policy issued on his life?  Legitimate 419A(f)(6) plans can be funded with insurance, but not individual insurance issued on an individual life with individual accounting to that insured for his individual payments into the policy.  In a legitimate plan, a group of 10 or more employers put money in a plan, designate the classes of employees who will be participating and the types of benefits which will be provided then the *administrator* meets with insurance agents to buy a policy – for the plan – to provide the benefits.  Just like a group health policy – in a legitimate plan there is no individual underwriting.  In a legitimate plan, underwriting information is obtained from individuals to quote a premium for *the group* of employees.  Guardian knew this was only a mock-up plan so – naturally – it sent its agents to sell its policy to an individual based on an individual application followed by individual underwriting.

6)      If "the plan" was buying the policy, why didn't the insurance salesman meet with a representative  of "the plan" and obtain group underwriting information?  This never happened. Guardian has no group experience underwriting data because it never sold a policy to "the plan."

7)      Guardian had the insurance applicants sign a statement that said Guardian would not issue the policy unless the applicant's lawyer/CPA gave Guardian a letter saying they recommended the Millennium Plan to the "participant."  Guardian completely ignored this term in the disclaimer they had the applicants sign because, just like every other self serving statement in the disclaimer, they knew it was prepared solely for the purpose of litigation and no one would read it.  Obviously, no one ever did because after two years of litigation in other Millennium Plan participant litigation, they have yet to produce a single such letter.

8)      Guardian intentionally set its insureds up for the fraud.  Guardian doesn't make money in this transaction unless people buy insurance; no reputable attorney/CPA would

recommend the Millennium Plan because a) it's a waste of money; and b) it had no chance of passing IRS muster. Guardian sends an insurance agent out to sell them insurance – Guardian doesn't particularly care what the agent says about the plan because they know the agent will present the disclaimer for signature in the stack of papers the insured signs.

9)     Guardian consented to, condoned and assisted in sending *Guardian* agents to the Millennium University so they could also be *Millennium Plan* agents but – per the memos – when they met with applicants they were selling "insurance" not the "plan." Although Guardian in the memos tells agents not to sell plans and not to recommend particular plans, Guardian required its agents to attend Millennium University for the express purpose of learning how to sell and recommend the plan. Guardian has yet to explain how that would work in practice. "The Plan" is a scheme to sell insurance. No one can get into the plan *unless* they **first buy an insurance policy**. If Guardian doesn't issue a policy, then the "participant" can't participate. **This is the single most important fact which proves Defendants were using the Millennium Plan as a RICO enterprise to sell insurance.** The Millennium Plan would not exist but for Guardian's (and other insurance companies') willingness to issue policies to the Millennium Plan. No one can participate in the plan without first buying an individually underwritten whole life policy from a Guardian (or other insurance company) insurance agent. There is no legitimate 419A(f)(6) plan that has that as a condition precedent. Guardian knew it. Every other Defendant knew it.

10)     Guardian says in its memos and disclaimers that it is not selling insurance to individuals but to "the plan." If that is so, why does Guardian lapse the policy for failure to pay *premiums* when the insureds stop paying *"contributions"* into the plan? If there is cash value in the policy when the "participants" stop paying "contributions," why does Guardian permit the Millennium Plan (a/k/a Bevan, Ridge and Cocks) to cash in the policy and keep the money? If this

is a 419A(f)(6) plan, why does the cessation of a person's "contributions" result in the forfeiture of *that person's* life insurance policy when §419A prohibits individualized accounting? Because it's nothing more than an insurance wolf in MEWA sheep's clothing. It's an insurance sales scheme and Guardian uses it to sell its insurance and defraud its insureds;

11)     If this is a bona fide 419A plan not sold as an "investment" vehicle, why does Guardian give the whole life *individually underwritten insurance applicant* a "policy illustration" just like the agent would any other man-off-the-street showing how much the policy will be worth if – God willing – you can pay premiums until you are 96. Not 95, not 97 – 96. The policy sold by Guardian to the Millennium Plan "participants" requires payments until the age of **96** to realize the fantastic growth potential of this unique investment opportunity.[4]

12)     When the Guardian agents attend the Millennium University – with Guardian encouragement – they learn how to deceive a person into unintentionally buying a Guardian whole life policy when they thought they were putting money in an interest bearing, tax advantaged investment. That's the purpose of it and all the Defendants know it. If this was not the fact, why would the Millennium University slide show instruct the insurance agents about how to compare the "Millennium Plan contribution" to a stock market investment? The only reason is because the Millennium Plan is presented as a tax advantaged investment.

13)     Every *"participant" is a small business owner*. There are no rank and file employees in the Millennium Plan. MEWA's are for employees, not owners. Owners put money in it because they are told it's a retirement or savings plan. They are not told that ALL of their money is being used to buy insurance.

---

[4]Less than 1% of the population lives to age 96.

**PLAINTIFFS' FIRST AMENDED COMPLAINT - CIVIL RICO**                    **PAGE 35**

14)      Guardian made Bevan and his company, Innovus, their agents so that they could pay them their share of the commissions directly.  Guardian knew that Bevan had formed the Millennium Plan.  Guardian knew that Bevan was using the Millennium Plan to sell insurance.  Guardian knew that Bevan was one of the presenters at the Millennium University.  Guardian told all of their other agents that when dealing with Millennium they would have to share their commissions with Bevan and Innovus.  But at the same time, Guardian was **mailing or emailing** fraudulent memos to its insurance agents contradicting all of these known facts solely to enable Guardian to assert plausible deniability when the house of cards started falling all around them.

6.72      Guardian used the **mail** and **interstate wire communication** to defraud Plaintiffs and other plan participants as follows:

1)      On or about February 10, 2004, Guardian **transmitted** by **interstate wire transmission** and/or **mailed** a policy illustration to its agent Joe Kane for a whole life policy on Plaintiffs;

2)      On or about December 16, 2005, Guardian **transmitted** by **interstate wire transmission** and/or **mailed** a policy illustration to its agent Arch Bonnema for a whole life policy on Plaintiffs;

3)      On December 16, 2005, Guardian **mailed** and/or **wire transmitted** to its agent Erik Liljenwall a payment history on policy number 4046301 on Plaintiffs' life and Liljenwall **mailed** those documents to Plaintiffs;

4)      On or about November 2, 2003, Plaintiffs' insurance policy application was **mailed** to Guardian by Guardian's agent, Jacob Bonnema;

5)      On or about the dates listed in section VII-B, above, Plaintiffs **mailed** checks to Defendant RBT who on or about those dates **wired money** or **mailed** checks to Guardian for premiums on Plaintiffs' policy;

6)      On or about February 3, 2004, Guardian **mailed** Plaintiffs' insurance policy to Defendant RBT;

7)      On January 23, 2006, Guardian's employee, Mark Schocken, **mailed** a letter to RBT informing them that Defendant Guardian would not refund any of Plaintiff's money or alter the terms of his policy; and

8)      On or about July 7, 2006, RBT **mailed** Plaintiffs' policy to Guardian and upon receipt Guardian cashed in Plaintiffs' policy and **wired** the amount of the cash value, approximately $80,000.00, to Defendant RBT.

6.73    Guardian's use of the **mail** and **wire** to defraud Plaintiffs occurred over the course of November 2, 2003, to February 7, 2008, and each occasion was specifically intended to defraud Plaintiffs.

**D.      Defendant Cock's Use of the RICO Enterprise.**

6.74    Jonathan Cocks was a small time accountant working out of his home before his acquaintance with Bevan/Barrow.  In 2003 an *insurance salesman* named Cooley approached one of Cocks' few clients about buying in to the Millennium Plan and, fortuitously, the client asked Cocks to attend the meeting.  Prior to this meeting, Cocks had never heard of a 419 plan but Cooley persuaded him and his client it was a "good investment" and his client, David Cunningham, obligated himself to pay an unknown amount of money into the Millennium Plan.  The next year – mid-2004 – is when Bevan/Barrow/Ridge began their attempts (unsuccessful as it turned out) to persuade the DOL that the Millennium Plan was a bona fide ERISA plan (it isn't, see below).

6.75     Bevan/Barrow/Ridge knew of course that a real ERISA plan is controlled by employers – not insurance salesmen – and, from the Millennium Plan's inception in 2002 until mid-2004, only Bevan, Ridge and Barrow had run the plan. The snow job on the DOL required creation of the appearance of propriety so Bevan/Barrow began asking people they knew they could control if they wanted to be "Plan Committee Members." One of their solicitees was Jonathan Cocks, participant Cunningham's accountant. Cocks accepted because Cunningham was paying for his time and he was otherwise not gainfully employed. At this time, the so-called committee was a Bevan/Ridge/Barrow rubber stamp because they controlled all the information and "action items" upon which the toothless "Plan Committee" was called upon for decision.

6.76     In mid-2007, Cocks suggested he become the "Plan Committee Chairman" since he didn't have much work as a CPA. At this time there were three people on the Plan Committee besides Cocks – all of whom had full-time jobs running their own businesses. Cocks suggested that, since there was $100 million worth of insurance in the fund, an appropriate salary would be $400,000 annually. Two of the Committee Members consented and one – who later resigned because his advice was ignored – objected. This was, and is, the best job Cocks has ever had and he now has a lucrative, vested interest in perpetuating the myth that the Millennium Plan is an actual 419A plan. For this purpose, he has committed numerous acts of **mail** fraud.

6.77     Unfortunately for the 500+ "participants" in the Millennium Plan, Cocks has obtained *carte blanche* access to the Millennium Plan's funds. He obtained this position in the following manner:

a)        the Millennium Plan Master Document provides for a "Plan Committee" because ERISA requires that a bona fide plan of this nature be controlled by the employers who put money in it;

b)      Bevan/Barrow/Ridge ignored this provision until the DOL began investigating the plan and attorney Ted Scallet advised them to create a Plan Committee as a shill so that they could claim that the employers controlled the Millennium Plan when in fact they all knew that this was not true;

c)      when the DOL investigation required Bevan/Barrow/Ridge to masquerade the Millennium Plan as an ERISA plan, they hand picked "participants" with whom they had some rapport.  When it became obvious that Cocks was their man and would blindly do as Bevan, Ridge and Barrow suggested, they encouraged Cocks to become the "Plan Committee Chairman" where he could make more money than he ever hoped to make as an accountant working from home.  Because of the financial incentive, Cocks was more than willing to do or say anything necessary to keep the plan alive so he could keep drawing his paycheck;

d)      there are 541 plan participants and only six or eight – including Cocks – have ever volunteered to be on the Plan Committee.  Two factors are at play.  One, people are too busy and, two, the potential liability is daunting to the average businessman.  Not so as to Cocks.  He has no assets to speak of anyway and the Millennium Plan is paying for a $5 million E&O policy for Cocks from AIG which is coming out of the "plan participants'" pockets.  So Cocks is making $400,000 per year (plus expenses), has a $5 million liability policy and can't be levied on for anything over that because he has no assets;

e)      Unfortunately for all who have money in the Millennium Plan, Cocks' ascension to the Plan Committee and the chairmanship of the Plan Committee coincided with Bevan's/Barrow's hiring of The Groom Law Firm and in particular one Mr. Ted Scallet who is billing "the plan", i.e., the fraud victims, $640.00 per hour to, along with Mr. Cocks, perpetuate the myth at all costs (since the "participants" are paying all the costs and, for the most part, have no idea what is going on).  Mr.

Cocks and Mr. Scallet have formed a symbiotic relationship whereby Cocks approves all of Scallet's bills and Scallet files every suit and motion known to the law in order to prolong the Millennium Plan's inevitable demise so that Scallet and Cocks can milk every last dime from the "participants" before the RICO enterprise is finally shut down;

f)      Scallet/Cocks control all the information disseminated to the victims so the fiction can continue *ad nauseum*.  For example, on October 5, 2007, the IRS issued its Letter Ruling (**Exhibit 2)** and Scallet/Cocks concocted the letter attached as **Exhibit 7** which Cocks **mailed** to all participants explaining why they couldn't send the letter to the Millennium Plan victims so they wouldn't know they were about to get hit with $300,000 penalties for participating in the Millennium Plan.  In addition. Although the IRS, according to the Letter Ruling, advised Millennium, MMG, Barrow and Bevan as far back as July 20, 2005, of the IRS's negative view of the Millennium Plan, no Defendant advised the plan participants of this fact, but instead continued to lead them to believe that a favorable ruling was imminent.

g)      Scallet/Cocks are making hundreds of thousands of dollars annually by concealing the fraud and filing frivolous lawsuits and groundless motions.  At this juncture, Scallet has not been sued for his participation in the RICO enterprise and Cocks is judgment proof.

6.78    Cocks has committed **mail fraud** in the following particulars:

1)      Cocks had numerous **interstate telephone calls** with Millennium Plan members all across the United States.  In these telephone conversations, Cocks discussed various issues including certain participants' refund requests and the purported status of the Millennium Plan's fight with the IRS.  Cock's concealed purpose was to deceive these plan participants into believing 1) the Millennium Plan RICO enterprise was a bona fide employee welfare benefit plan; and 2) based on his experience, knowledge and research as a CPA, the Millennium Plan would prevail in its litigation

against the IRS and establish its legitimacy. Cocks' purpose was to ensure that the Millennium Plan continued as an ongoing RICO enterprise so he could continue to profit from the fraud. Cocks has also refused to provide plan members with a copy of the IRS Letter Ruling claiming that if it was disseminated among the plan participants, it would jeopardize the Millennium Plan's position regarding the deductibility of contributions and by claiming that a Court had ordered it not be circulated. These statements were false. Cocks did not want the Letter Ruling sent to plan participants because he knew when they found out they were subject to $300,000 per year penalties three things would happen: 1) the participants would demand their money back *en masse*; 2) virtually everyone would stop putting money in the plan; and 3) the RICO enterprise would collapse and Cocks would lose his $400,000 per year job. Cocks has said and done everything imaginable to prevent the participants from seeing the Letter Ruling, including engaging in **mail fraud** as detailed below;

2)       On October 15, 2007, Cocks **mailed** a letter to all participants informing them an unfavorable Letter Ruling had been issued by the IRS and that he would send them a "summary" of the ruling. Cocks said in the letter that the ruling was "unfavorable" and held the Millennium Plan was a listed transaction. But he also told them the Letter Ruling was *inadmissible* in evidence, which of course is not true. What Cocks should have told the participants is that they had been defrauded and then list the reasons (all of which are detailed elsewhere in this Complaint) why the Millennium Plan was not an even remotely defensible 419A plan. He did not, has not and will not reveal the truth to the Plan participants because he, like the other Defendants, is using the Millennium Plan as a RICO enterprise;

3)       On November 15, 2007, Cocks **mailed** another letter to all participants advising them to consult with an attorney about filing form 8886 which is notification of investment in a Listed

Transaction. In spite of Cocks' knowledge about the true nature and purpose of the Millennium Plan, in this letter he continues to tell the plan members he and MMG (Bevan) "strongly disagree" with the IRS;

4)     On December 19, 2007, Cocks **mailed** all plan members a letter mischaracterizing developments in the IRS litigation with the intent to create the impression that the Millennium Plan was the victim of IRS harassment (the real reason: the Millennium Plan is an insurance scam) and that Cocks and the Millennium Plan "advisors" were confident of prevailing.  Once again Cocks concealed the true nature of the plan and his false encouragement was solely intended to prevent a run on the bank.  In this letter Cocks also says he and the Plan Committee  decided not to send out the Letter Ruling because that would be deemed "publishing" it and that this would negatively impact their position with the IRS.  The Letter Ruling was devastatingly detrimental to every plan participant; many were being audited and/or having hundreds of thousands of dollars in penalties imposed, yet Cocks was concealing the contents of the Letter Ruling solely for the purpose of protecting his salary, which, by the way, was being paid by the people he was defrauding. Additionally, this letter informs participants that the "Legal Defense Fund" to which they had been contributing had hired a lawyer named Michael Lloyd – one of Barrow's friends – to represent them. Unbeknownst though to the participants, Lloyd assisted Barrow in setting up the Millennium Plan, has entered into a "419 Coalition with Barrow and another attorney that saw the Millennium Plan as a way to line his pockets, David Marcus, and these three lawyers intended to milk the Millennium Plan participants as well by continuing the fiction that the Millennium Plan was valid and would ultimately pass IRS muster.  Lloyd then set up an **internet site** where for $500, he would prepare certain documents for plan participants to supposedly protect them from IRS penalties.  This charge was imposed despite the fact that Lloyd was also part of the Legal Defense Fund that each plan

participant paid into supposedly to provide them with legal assistance at "no charge" for this very service. Cocks referred all plan participants to Lloyd without revealing his conflicts and allowed Lloyd to charge fees for services which should have been provided free of charge as part of the Legal Defense Fund. Lloyd is equally committed to perpetuating the fiction regarding the purported legitimacy of the Millennium Plan.

5)     On January 14, 2008, Cocks **mailed** to the participants a letter encouraging them to write their congressman requesting that they, basically, repeal the laws the IRS uses to discover phoney tax shelters. It ends with a friendly reminder that if anyone stops sending money, **all the money they paid will be forfeited**. This is more irrefutable evidence the Millennium Plan is a RICO enterprise – in a legitimate 419A plan, a cessation of payments results in discontinuance of participation in the plan; there is nothing to "forfeit," nothing for the plan to confiscate as Cocks threatens to do because a legitimate plan is not an investment. All the plan participants were told *they* had an individualized account into which *their* money was deposited which would then grow at a fantastic rate. It is the plan participants' *individual* accounts Cocks is threatening to seize. And, in fact, Cocks/Bevan/Ridge have confiscated many of the life policies and cashed them in – the money goes almost exclusively to pay Cocks' salary and the enormous legal fees of Scallet, Barrow, Lloyd, Marcus and others.

6)     Cocks' next instance of **mail fraud** is connected to a correspondence chain commenced by Barrow. On November 16, 2005, Barrow **mailed** Plaintiff a letter acknowledging the Bonnema Defendants defrauded Plaintiff and informing him that, while the Bonnemas said he could pay money in for five years, he really had to pay money for *forty-five years*! But, not to worry, MMG (Bevan/Ridge) purportedly had it all worked out with Guardian such that Plaintiff could stay in the plan but his "benefits" would be sharply reduced. This letter of course was a ploy. Barrow

says that the Bonnemas misinformed Plaintiff about how long he would have to pay in to the plan when Barrow knew that the Bonnemas told Plaintiff and many others exactly what Barrow/Bevan/Ridge/Guardian/Millennium expected them to tell people, i.e., the Millennium Plan was a fantastic tax advantaged investment and, like any investment, the amount invested each year, if any, was up to the individual investor.   Barrow's letter implies Plaintiff understood he was contributing to a MEWA, but that he was misinformed about how long and how much he would have to contribute.   She knew this was not true.   Barrow was one of the presenters at Millennium University where agents were told to tell prospects they could put money in the plan for "3, 5 or 10 years" – now in this letter she tells Plaintiff the Millennium Plan was "structured to require level contributions . . . until age 96."   She goes on with two pages of senseless wanderings about "Rating Group Dynamics" and "Life Benefit scenarios", then ends with   "Let me know which of the settlement options your participants prefer."   Barrow is fully aware, of course, that there are no "participants" and that it's just Plaintiff, Malcolm Renwick, who was defrauded, but, like all the Defendants, she is attempting to perpetuate the MEWA myth because, at the time of this letter, she was employed by Bevan, and being paid more money than she had ever made in her life.   Two months after the November 16, 2005, Barrow letter, Guardian mailed a letter to RBT that said it was disregarding the Barrow letter because she had no authority to speak for Guardian.

7)   On July 23, 2007, Plaintiff wrote Dustin Lambert, who works for SecurePlan, and RBT, saying he wanted to withdraw from the Millennium Plan.   In response, on July 24, 2007, Ms. Karen Shumate who works for MMG, Innovus and Bevan, **mailed** Plaintiffs a letter saying that MMG would honor Plaintiffs' request and "void the transaction." if Plaintiff sent a $1,000.00 fee, which he did on January 4, 2008, after getting further clarification about what he needed to do.   Then, on January 28, 2008, Shumate **mailed** Plaintiff a letter saying "the Plan Committee Chairman"

**PLAINTIFFS' FIRST AMENDED COMPLAINT - CIVIL RICO**                                        **PAGE 44**

(Cocks) told her to return Plaintiff's $1,000.00 check and the transaction **would not** be voided. On February 7, 2008, Cocks **mailed** a letter to Plaintiff saying the Millennium Plan would not void the transaction. This same scenario was played out with other plan participants who discovered the fraud and demanded return of their money. Barrow (Bevan's employee) is the seemingly helpful good cop who, when informed of these rogue Bonnema agents, was going to make it so that the member at least didn't have to put any more money in, then even has Ms. Shumate write saying the transaction will be voided; then the bad cop Cocks steps in to confiscate all the money. Barrow/Bevan point the finger at Cocks and Cocks points to the "Plan documents which Barrow/Bevan drafted." All of the Defendants are acting in concert, reading from the same script and constantly communicating throughout this ruse to keep the shell game going and the participants completely confused about what happened to all their money.

### E.    Milliman's Use of the Millennium Plan as a RICO Enterprise.

6.79    This Defendant, like Guardian, was instrumental and indispensable to the success of the Millennium Plan as a RICO enterprise. Milliman's motivation was the same as for all other Defendants – money. That firm was paid hundreds of thousands of dollars to devise, and continually revise, actuarial "rating groups" which had to be bastardized from the data and tables used in a legitimate MEWA. This is the purpose of the "rating groups":

1)    The fundamental failing of bogus 419A plans is that they must use individualized accounting so that the fraud victim thinks they have an "investment account;"

2)    Millennium Plan victims are all told they will get their money back – with interest – so somehow, someone has to keep track of it;

3)      However, that's not how real 419A plans work.  In a real one, a true group exists and the plan itself actually buys insurance to cover the participants.  Bevan/Ridge/Barrow were caught in a predicament here;

4)      The scheme needed some form of disguise so when the IRS looked at it, it wouldn't be so painfully obvious it was a RICO enterprise and the conspirators would have a colorable basis for saying, "Well, we thought this complied with the regs."  Enter Milliman and "rating groups." Although the conspirators characterize these rating groups as rocket science which only actuaries and insurance salesmen understand, they are nothing more than a list of plan members' names, purportedly grouped by what the Milliman computer says are common characteristics – like non-smoking males between 55 - 60 years old.  When initially determining a plan member's Life Benefits and Death Benefits, Millennium simply took that individual's insurance policy cash values and projections, tweaked them a bit by adding an "actuarial fee" – part of Milliman's cut for helping legitimize the deal – and then spit out a slightly modified figure representing the investment returns purportedly available under the plan.  Milliman knew this was bogus.  Like Guardian, Milliman is a global company with dozens of actuaries and lawyers on staff.  They knew they were being asked to devise a scheme that, hopefully, would fool the IRS into believing the plan members were subject to group underwriting/premium calculations when Milliman and every other conspirator knew that wasn't so.  As this RICO enterprise began its siege phase after the IRS Letter Ruling was issued and the 30-day letters started going out, Milliman and the other Defendants realized they had way too many "rating groups" (virtually every participant had their own group, commensurate with the necessity for individualized accounting).  Therefore Milliman redirected everything to only four rating groups for the 500+ participants to give it more the shape of a real MEWA.  By trial time, there will probably be only one;

5)      This "rating group" slight of hand is necessitated because this is a fake 419A plan. The conspirators' problems begin, of course, with the deceptions necessary to induce participation. Imagine the reaction if the insurance salesman told the participant "you put $100,000.00 a year in this plan until you're 96 years old, the first $100,000.00 is my commission, you're paying for a whole life policy but you don't own it, and any money you get back is going to be determined by what rating group Milliman puts you in and how many people die or get sick that are in your group. And, by the way, if you ever stop paying, the plan will confiscate *all* your money." This is exactly how it works, but, quite obviously, not what the fraud victims are told;

6)      Bevan/Ridge conned their first fraud victim in mid to late 2002; now, seven years later, 500+ people have been scammed out of about $300 million and the Defendants have spent/wasted/lost about $200 million of that. Milliman's participation, as it turns out, was part of the wasted money – here's why. None of the victims had any idea what a rating group was, or who Milliman is. Milliman's effort was directed toward deceiving the IRS but, as it turns out, the IRS wasn't fooled and all the money the fraud victims unwittingly poured down the Milliman rat hole was for naught.

6.80    Milliman engaged in direct or indirect use of the **mail** to commit fraud in the following particulars:

6.81    In or around April 2005, Milliman sent Defendant Barrow by **mail or interstate email transmission** the Milliman spreadsheet calculating the "Millennium life benefits" for 2005;

6.82    In or around May 2005 Millennium sent Defendant Barrow by **interstate mail or email transmission** a bill exceeding $150,000.00 for work on the Millennium Plan;

6.83    In or around October 2005, Milliman sent Defendant Barrow by **interstate mail or email transmission** Milliman's "whole life rating assignments";

6.84     On October 4, 2005, Milliman sent Barrow and Innovus by **interstate email transmission** a spreadsheet showing suggested rating group and benefit assignments for new Millennium Plan participants;

6.85     On October 20, 2005, Milliman sent Barrow and Innovus by **interstate email transmission** list of recommended rating group assignments and benefits for participants transferring into the Millennium Plan;

6.86     On November 11, 2005, Milliman sent Barrow, Innovus and RBT by **interstate email transmission** a request for approval of rating group and benefit assignments for select Millennium Plan participants;

6.87     On December 21, 2005, Milliman sent Barrow, Innovus and RBT by **interstate email transmission** a request for approval of rating group and benefit assignments for select Millennium Plan participants;

6.88     On July 21, 2006, Milliman **mailed** to Defendant Bevan an invoice for $58,333.89 for services Milliman performed for the Millennium Plan which included projections, a Plan peer review, peer review Stochastic Calculations, analysis of plan benefits in Texas, participant requests for discontinuance of contributions, reports of in force policies as of December 31, 2005, pending certificates of participation, rating group inconsistencies with funding, preparing projections using plan cash to pay benefits and projections using cash instead of loans, discussing economic benefit submission to the IRS, preparing benefit reports/tests for the IRS, reviewing rating group assignments for Barrow, preparing projections of the Millennium Plan for the IRS, changing projection assumptions and reviewing values, reviewing Plan Committee duties, conducting follow-up concerning files sent to the IRS, changing projections, and re-running projections with new

assumptions. All of these documents had previously been transmitted by Milliman by **mail or interstate email transmission** to one or more Defendants.

6.89     On February 22, 2007, Milliman **mailed** to Defendant Bevan an invoice for $13,865.00;

6.90     On March 22, 2007, Milliman **mailed** an invoice to Cocks for $15,583.75;

6.91     On April 23, 2007, Milliman **mailed** to Cocks an invoice for $13,606.25;

6.92     On April 30, 2007, Millennium **mailed** to Defendant Barrow a memorandum of "Millennium Plan Benefits for 2007". This memorandum states that Milliman's intention is to base each individuals's death benefit on that individual's life insurance policy;

6.93     On May 9, 2007, Milliman **mailed** a "memorandum" regarding proposed Millennium Plan's benefits to all members of the Plan Committee;

6.94     The above referenced report links the "death benefits" to the death benefit for the corresponding life insurance policy, and admits that the benefits are based on the premiums paid by the individual participants and correspond with the face amount of their life insurance policies;

6.95     The above referenced report is also accompanied by an appendix which lists every individual "participant" along with that individual's "benefits;"

6.96     On May 10, 2007, Milliman sent by **interstate email transmission** a life benefit report;

6.97     On May 14, 2007, Milliman sent by **interstate email transmission** to Cocks, Barrow, Innovus & RBT a memorandum, report and appendices regarding 2007 Millennium Plan proposed benefits and report of comparisons of 2006 and 2007 rating group assignments and benefits;

6.98     On May 14, 2007, Milliman sent by **interstate email transmission** to Cocks the 2007 Millennium Plan benefits report;

**PLAINTIFFS' FIRST AMENDED COMPLAINT - CIVIL RICO**              **PAGE 49**

6.99    On May 14, 2007, Milliman sent by **interstate email transmission** to Cocks revised appendices to the 2007 Millennium Plan benefits report which added additional plan   participants to the rating groups;

6.100   On May 17, 2007, Milliman **mailed** to Cocks an invoice for $33,830.00 for actuarial services Milliman performed for the Plan in February, March and April 2007;

6.101   On July 27, 2007, Milliman **mailed** to Cocks an invoice for $2,025.00 for actuarial services Milliman performed for the Plan in June 2007;

6.102   On August 9, 2007, a "projection of Millennium Plan" was **mailed** by Milliman  to Jonathan Cocks.

6.103   On August 17, 2007, Milliman **mailed** to Cocks an invoice for $14,378.75 for services Milliman performed for the Millennium Plan in July 2007 which included conference calls and meetings with Bevan and Gregg Ridge;

6.104   On October 15, 2007, Milliman **mailed** to Cocks an invoice for $3,437.50 for services Milliman performed for the Millennium Plan which included estimating 2008 life benefits, considering insurance policy borrowing questions posed by Cocks, reviewing allocations of investment income among rating groups, and reconciling projections to Plan contributions;

6.105   In or around November 2007 Milliman sent to Cocks by **mail or interstate email transmission** a invoice for October 2007 in the amount of $3,075.00.

6.106   In or around December 2007 Milliman sent to Cocks by **mail or interstate email transmission** a invoice for November 2007 in the amount of $8,712.50.

6.107   On January 7, 2008, Milliman **mailed** to Cocks an invoice for $5,400.00 for services Milliman performed for the Millennium Plan in December 2007 which included an analysis of Peer Review Economic Values, an audit for non-transfer cases, and allocations of investment income;

**PLAINTIFFS' FIRST AMENDED COMPLAINT - CIVIL RICO**                              **PAGE 50**

6.108   Page 2 of this report says that Milliman is relying, in part, on "policy account values" evidencing that Milliman recognized individual accounts were maintained for each participant. On page 7 of this report, Milliman makes the statement that "the supporting insurance policy for each of these participants is projected separately." Additionally, the "plan contribution amounts are based on the contribution for $1,000.00 of insurance for the death benefit identifier of which the participant is a member," that "contributions are paid beginning on July 1 of the issue year of the insurance policy," and that all participants "enter the plan with a supporting policy . . . ." Page 9 of the report states "there may be times when the plan releases a participant from the plan by unwinding the transactions for the participant, but these are ignored as they are expected to be minimal." This document proves that Milliman intentionally participated in the RICO enterprise and knew that it was nothing more than an insurance sales scheme;

6.109   On August 17, 2007, Milliman **mailed** an invoice to Cocks for $14,378.75;

6.110   On September 6, 2007, Milliman **mailed** a billable hours report to Jonathan Cocks;

6.111   On October 15, 2007, Milliman **mailed** an invoice for $3,437.50 to Jonathan Cocks for "actuarial services";

6.112   On December 19, 2007, Milliman **mailed** an invoice to Cocks for $11,787.50;

6.113   On April 23, 2008, Milliman sent by **mail** a "live benefit determination of 2008" letter which frankly admits that "as discussed in previous communications, the four life benefit rating groups currently in use in the Millennium Plan were developed in 2005 in order to more closely meet the Internal Revenue Code Section 419 10% rule for qualification as a multiple employer welfare benefit plan."

**F.     BKD's, SecurePlan's and RBT's Use of the RICO Enterprise.**

6.114     BKD, SecurePlan and RBT had identical involvement in the conspiracy.  BKD was the "third party administrator" (TPA) from January 2003 to June 2005 and SecurePlan began in July 2005 and is in that position presently.  RBT is the purported "Trustee" of the Millennium Plan. SecurePlan is an affiliate of RBT, operates out of the same office as RBT and uses many of the same employees as RBT.  All three engaged in extensive **mail fraud** since they are the entities which billed (**by mail**), collected the money (**by mail**) from the fraud victims, and received (**by mail**) the insurance policies on the participants lives.  Their instances of **mail fraud** are detailed in section VII-B above.  All of these entities are experienced TPAs or banks, all had top level management personnel who read the Millennium Plan formation documents, who were familiar with the IRS regulations, statutes and notices detailed above and who realized the Millennium Plan was nothing more than an insurance scam.  Most, if not all, the **mailed** items from these entities reference the "Adoption Agreement" which makes it patently obvious this is an insurance scam because:

1)     The only "participants" shown in this so-called "agreement" are Plaintiff Malcolm Renwick and his P.C.  A legitimate MEWA has *employees* as beneficiaries – that's why they're called *employee* welfare benefit plans.  **Every policy sold in this scam was sold to husband-wife business owners, sole owners or two- or three-partner owners of a business**.  There was **no sale** to an enterprise who bought into the plan for the rank and file, which is the purpose of a 419A plan. The so-called Adoption Agreement looks like it was drafted for a Teamsters collective bargaining agreement with Consolidated Freight when, in actuality, every Defendant knew it was intended to be presented to mom and pop businesses or sole proprietorships where the people had made some money they wanted to put away for retirement – like Malcolm Renwick.  No one even shows up on the "classes of employees participating" section except the owners;

PLAINTIFFS' FIRST AMENDED COMPLAINT - CIVIL RICO                                    PAGE 52

2)      The so-called Adoption Agreement is replete with self-serving disclaimers and intentionally false statements like the "Plan assets are not credited to the account of any particular employer." Of course BKD, SecurePlan and RBT (and every other Defendant) knew this was false because these three Defendants had the records/copies of the individually underwritten life insurance policies, kept individual accounting records of the contributions, kept records of the individual premium payments and *made the premium payments* on the individual policies. And if a participant quit paying contributions to the Millennium Plan, then the insurance policy on this participant's life was forfeited by BKD/SecurePlan/RBT. These were also the Defendants who actually confiscated participants' money when they found out they had been scammed and stopped paying;

3)      The so-called Adoption Agreement never once mentions that the "contributions" were being used to pay insurance premiums and BKD, SecurePlan and RBT were taking the people's money and paying *insurance premiums* with it when every Defendant knew and intended this to be concealed from the fraud victims;

4)      The so-called Adoption Agreement purports to acknowledge that the "employer" (i.e., fraud victim) received the Master Plan before paying any money but – again by design – no one was ever provided a Master Plan document until **after** BKD, SecurePlan or RBT sent the money to the insurance company and the policy had been issued. No one got "the Plan" until they were in "the Plan", and that first required issuance of a life insurance policy.

6.115   This last point is what makes these Defendants' conduct particularly egregious – they handled the money, received it by **mail** and **mailed** or **wired** it to the insurance companies with full knowledge that *none* of the plan documents ever revealed the "contributions" were nothing more than insurance premiums.

G.   **Concluding Summary of the Interaction Among the Defendants, Their Use of the RICO Enterprise and Commission of Mail and Wire Fraud.**

6.116   **Bevan/Ridge/Barrow** – originally devised the Millennium Plan, **mailed** and **emailed** and caused to be **mailed** and **emailed**, hundreds of documents and had numerous **interstate telephone conversations** between each other and to all other Defendants in furtherance of the scheme.

6.117   **Guardian** – insurance company which issued Plaintiffs' (and many other victims') whole life policy, **mailed** and **emailed** plan documents with suggested changes to Bevan/Ridge/Barrow, **mailed** insurance policies and premium notices and engaged in many **interstate telephone calls** and **emails** and **mailed** numerous documents with these and the Bonnema Defendants. All premium payments received by this Defendant were by **mailed** checks or **interstate wire transfers**.

6.118   **Milliman** – actuarial company who devised phoney rating groups to deceive IRS and participants, **mailed** and **emailed** hundreds of copies of rating group lists and information to Bevan/Ridge/Barrow and Cocks along with dozens of invoices and items of correspondence;

6.119   **Cocks** – so-called "Plan Committee Chairman" who **mailed** or caused to be **mailed** numerous documents including many deceptive letters to insureds, and letters threatening to confiscate the insureds' policies and who took and assisted others in taking hundreds of thousands of dollars from insureds. Cocks had numerous **interstate phone conversations** with the plan participants.

6.120   **Bonnemas** – the  agents who sold the Millennium Plan and insurance policy to Plaintiffs and many others. These Defendants defrauded victims out of millions of dollars and made hundreds of thousands of dollars in commissions. They **mailed** dozens of applications, "Adoption

Agreements" and checks to Bevan and had **hundreds of interstate telephone calls** with Guardian and Millennium personnel in furtherance of the conspiracy.

6.121   **BKD & SecurePlan** – the so-called "plan administrators" took in millions of dollars from victims, confiscated victims' money by cashing in their policies, sent out hundreds of bills for bogus "administrative fees" and exchanged hundreds of items of **correspondence** with the other Defendants in furtherance of the conspiracy.

6.122   **RBT** – the "trustee" who received by **mail** from Guardian and other insurance companies the victims' policies, **mailed** dozens of invoices to Cocks for monthly fees, received dozens of **mailed** checks for the fees from BKD and SecurePlan and who **mailed** to Guardian (and other insurance companies) Plaintiffs' (and other victims') money so the Defendants could confiscate the same through their fraudulent insurance sales scheme.

## VII.

## CAUSES OF ACTION

**A.      Civil RICO – Wire and Mail Fraud.**

7.01   18 USC §1964(c) provides a private right of action for mandatory treble damages, costs and attorney's fees to "any person injured in his business or property by reason of a violation of §1962(c) which makes it "unlawful for any person employed by or associated with" a RICO enterprise "to conduct or participate . . . in the conduct of such enterprises affairs through a pattern of racketeering activity" including "**mail fraud** and **wire fraud.**" §1961(1)(B), **mail fraud,** 18 USC 1341, and **wire fraud,** §1343, which prohibits use of the **mails** or any **interstate wire transmission** for the purpose of implementing a scheme to defraud for the purpose of obtaining money.   All Defendants conspired to, and did, operate the Millennium Plan as a RICO enterprise to defraud Plaintiffs, and 500+ other victims, out of money by means of **mail** and **wire** fraud.   Every Defendant

received a portion of all the money obtained from Plaintiffs by fraud through use of the Millennium Plan as a RICO enterprise.

7.02     Defendants, individually and in conspiracy with one another, are all RICO persons who violated RICO by engaging in (1) "racketeering activity," (2) conducted through a "pattern," (3) affecting an "enterprise," (4) impacting interstate commerce.  Defendants violated 18 USC §1962(c), by conducting and participating in the conduct of the affairs of an enterprise (the Millennium Plan) that is engaged in or affects interstate commerce through a pattern of racketeering activity (mail and wire fraud) as alleged herein.  Defendants also violated 18 USC §1962(d) by conspiring as alleged herein to violate 18 USC §1962(c).  All of Defendants' predicate acts have a similar purpose - to deceive the investors and to sell large life insurance policies - all have similar victims, small mom and pop business owners, all have had similar results, the investment of substantial sums in what is purported to be a tax advantages investment vehicle but which in reality is nothing more than an entrepreneurial enterprise designed to conceal the sale of large life insurance policies.  The methods of commission of the fraud has been virtually identical and was scripted by the principal participants in the fraudulent scheme.  Defendants' repeated and persistent use of interstate mail and wire transmission to commit and perpetuate their fraud is related in time and purpose, is continuing, threatens to continue indefinitely into the future and constitutes a pervasive "pattern" of racketeering activity.  Plaintiffs have been damaged in that they have lost all of the money they invested as a direct result of Defendants' violation of 18 USC §1962.  And it is this money that Plaintiffs lost that is used to invest in the insurance policies (and pay the insurance commissions thereon) that are then held by the RICO enterprise, the Millennium Plan, and which is then paid out to many of the other RICO participants as alleged herein.

7.03    Plaintiffs are entitled to recover mandatory treble damages, cost and attorney's fees under 18 USC §1964(c). This Court should also order appropriate relief under 18 USC §1964(a).

**B.      Breach of Fiduciary Duty.**

7.04    Defendants owed Plaintiffs a fiduciary duty as a result of their position of trust as investment advisors. Further, RBT was a "trustee", Secure Plan and BKD were TPAs who were supposed to fulfill the trustee's duties, and MMG as the "plan sponsor" agrees in its contract that it has fiduciary duties as a "trustee" to the "plan participants." The actions of the Defendants as described above constitute a breach of their fiduciary duty thereby causing Plaintiffs damage for which they sue. Plaintiffs further sue all Defendants for disgorgement of all funds obtained as a result of the breach of fiduciary duties by Defendants and any of their agents or advisors as a result of their breach of fiduciary duty, as well as disgorgement of all profits or gains achieved by any Defendant from said funds.

7.05    Defendants also owed Plaintiffs a fiduciary duty as a result of their position of trust as the ones controlling Plaintiffs' funds. In addition, the funds invested purported to be held in trust for the benefit of Plaintiffs. Defendants have breached their duty of trust by self-dealing, using Plaintiffs' funds for their own benefit, failing to adequately or timely account to Plaintiffs for their funds, failing to put the interests of Plaintiffs first in the handling of said funds and otherwise in engaging in the conduct complained of herein. Defendants are strictly liable for all losses suffered by Plaintiffs as a result of Defendants' breach of their fiduciary duties all for which Plaintiffs sue. Plaintiffs also sue for disgorgement of all funds and gains therefrom.

**C.      Unjust Enrichment.**

7.06    Defendants obtained funds and profits from the Plaintiffs by fraud perpetrated by the Defendants and the taking of undue advantage of the Plaintiffs in the manner described above.

Defendants' conduct gives rise to a cause of action on behalf of Plaintiffs under the equitable remedy of unjust enrichment, which cause of action is hereby stated.

### D.   Money Had and Received.

7.07   Defendants obtained money from Plaintiffs which in equity and good conscience belongs to Plaintiffs. Said actions of Defendants give rise to a cause of action on behalf of Plaintiffs under the equitable theory of money had and received, which cause of action is hereby stated.

### E.   Article 541.151, Texas Insurance Code Deceptive Trade Practices

7.08   The conduct of Defendants as alleged above are all in violation of statutory sections of the Texas Insurance Code thereby giving rise to a claim under Article 541.151 Tex. Ins. Code and the Deceptive Trade Practices Act ("DTPA"). Said violations are a producing cause of Plaintiffs' damages. Specifically, Defendants' misrepresentations violate the Texas Insurance Code and DTPA in the following respects:

(a)   Defendants misrepresented the terms, benefits or advantages of the insurance in violation of Texas Insurance Code Article 541.051.

(b)   Defendants made, or directly or indirectly caused to be made, an assertion, representation or statement with respect to insurance that was untrue, deceptive or misleading in violation of Texas Insurance Code Article 541.052.

(c)   Defendants misrepresented a material fact in violation of Texas Insurance Code Article 541.061.

(d)   Defendants failed to state a material fact necessary to make other statements not misleading, considering the circumstances under which the statements were made in violation of Texas Insurance Code Article 541.061.

(e)   Defendants made misrepresentations in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact in violation of Texas Insurance Code Article 541.061.

(f)   Defendants caused confusion as to the source, sponsorship, approval or certification of the investment in violation of DTPA §17.46(b)(2).

(g)     Defendants represented that the investment and their services had sponsorship, approval, characteristics, uses and benefits which they did not have in violation of DTPA §17.46(b)(5).

(h)     Defendants represented that the investment and their services were of a particular standard, quality or grade when they were not in violation of DTPA §17.50(b)(7).

(I)     Defendants failed to disclose information regarding the investment and their services which was known at the time with the intent of inducing Plaintiffs into a transaction in which they would not have entered had the information been disclosed in violation of DTPA §17.50(b)(24).

7.09    Plaintiffs further sue for trebling of these damages and allege that Defendants' misrepresentations as described herein were committed "knowingly," in that Defendants had actual awareness, at the time of the acts complained of, of the falsity, deception or unfairness of the conduct in question, thereby entitling the jury to award Plaintiffs three times their economic damages as additional damages under Article 541.152 of the Texas Insurance Code and DTPA §17.50, for which Plaintiffs sue.

7.10    Plaintiffs sue for reasonable and necessary attorneys' fees for the preparation and trial of this cause and any appeal therefrom pursuant to Article 541.152 of the Texas Insurance Code and DTPA §17.50(d), taking into consideration all relevant factors.

## VIII.

## REQUESTED RELIEF

8.01    Plaintiffs request Defendants to be cited to appear and answer and that they have judgment for their damages, treble damages, punitive damages, costs, interest, attorney's fees, relief under 18 USC §1964(a) and any other relief to which they may show themselves entitled.

Respectfully submitted,

By:   */s/ David H. Martin*
      John L. Malesovas
      State Bar No. 12857300
      David H. Martin
      State Bar No. 13057850
      MALESOVAS & MARTIN
      P. O. Box 1709
      Waco, Texas 76703-1709
      Telephone:    (254) 753-1777
      Fax:    (254) 755-6400
      john@malesovas.com
      david@malesovas.com

-and-

      Anthony L. Vitullo
      State Bar No. 20595500
      FEE, SMITH, SHARP & VITULLO, LLP
      Three Galleria Tower
      13155 Noel Road, Suite 1000
      Dallas, Texas 75240
      Telephone:    (972) 934-9100
      Fax:    (972) 934-9200
      lvitullo@feesmith.com
      ***Attorneys for Plaintiffs***